**Roy William HARRIS, Petitioner,**

v.

**UNITED STATES of America,**
**Respondent.**

**No. 97 CIV.1904(CSH).**

United States District Court,
S.D. New York.

May 20, 1998.

John B. Conway, Greenwich, CT, Jed Davis, Mitchell & Davis, Augusta, ME, for Petitioner.

Mary Jo White, United States Attorney Southern District of New York, for the United States of America; George S. Canellos, Assistant Unites States Attorney, of Counsel.

## MEMORANDUM OPINION
### AND ORDER

HAIGHT, Senior District Judge.

Roy William Harris petitions this Court pursuant to 28 U.S.C. § 2255 for a writ of habeas corpus setting aside his prior conviction, and under Rule 33, Fed.R.Civ.P. for a new trial. The government resists Harris's applications in their entirety.

PART I. *Procedural Background*

On September 9, 1992, a grand jury sitting in this district returned a 24–count superseding indictment charging Roy William Harris with conspiracy to commit wire and bank fraud in violation of 18 U.S.C. § 371, wire fraud in violation of 18 U.S.C. § 1343, bank fraud in violation of 18 U.S.C. § 1344, money laundering in violation of 18 U.S.C. § 1956(a)(2), conducting a continuing financial crimes enterprise ("CFCE") in violation of 18 U.S.C. § 225, and making a false statement on a loan application in violation of 18 U.S.C. § 1014.

Prior to trial, Harris moved to dismiss certain counts of the indictment and also to sever Count 23, which charged him with making a false statement on a loan application. This Court granted Harris's motion to sever Count 23, but denied his motion to dismiss those counts charging him with wire fraud, bank fraud, and engaging in a continuing financial crimes enterprise. *See United States v. Harris*, 805 F.Supp. 166 (S.D.N.Y. 1992).

A jury was empaneled on November 9, 1992. On December 14, 1992, the jury found Harris guilty on all counts tried.

On March 26, 1993, Harris filed motions for a judgment of acquittal, pursuant to Rule 29, Fed.R.Crim.P., and for a new trial, pursuant to Rule 33. This Court denied Harris's motions in their entirety. *See United States v. Harris*, 1993 WL 300052 (S.D.N.Y.). Prior to sentencing, Harris moved for downward departures from the United States Sentenc-

ing Guidelines. This Court denied those applications after conducting an evidentiary hearing. *See United States v. Harris,* 1994 WL 683429 (S.D.N.Y.).

On December 22, 1994, this Court sentenced Harris to a 188–month term of imprisonment, a 5–year term of supervised release, and a direction that Harris pay $200 million in restitution.

In an opinion dated February 28, 1996, the Second Circuit upheld Harris's conviction and sentence, except for the restitution order, which the Court of Appeals remanded to this Court for further proceedings. *See United States v. Harris,* 79 F.3d 223 (2d Cir.1996).

On October 7, 1996, the Supreme Court denied Harris's petition for a writ of certiorari. *See Harris v. United States,* —— U.S. ——, 117 S.Ct. 142, 136 L.Ed.2d 89 (1996).

On March 18, 1997, Harris filed this petition pursuant to 28 U.S.C. § 2255 and Rule 33, for habeas corpus setting aside his conviction and for a new trial.

PART II. *Timeliness of the Petition*

■ Against this procedural background, I must consider the timeliness of Harris's petition in light of the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), effective April 24, 1996.

Because the timeliness of a habeas corpus petition is jurisdictional in nature, I raised the question *sua sponte* in an opinion dated February 13, 1998, familiarity with which is assumed, and directed the parties to address it. They have done so.

I am now satisfied that Harris's petition is timely. The Court's February 13, 1998 opinion incorrectly stated at slip op. 1 that Harris did not petition the United States Supreme Court for a writ of certiorari. As the preceding Part of this opinion notes, Harris did file such a petition, which the Supreme Court denied on October 7, 1996. I therefore conclude that Harris's judgment of conviction did not become final for purposes of the one-year period of limitation contained in 28 U.S.C. § 2255 until that date. By that time the AEDPA had become effective. Harris's

petition, filed on March 18, 1997, was within the one-year statutory time limit.

Accordingly the Court will consider the petition on its merits.

PART III. *Factual Background*

The facts of this case are set forth in detail in the cited opinions of this Court and the Court of Appeals, familiarity with which is assumed. I recount the facts in this opinion to the extent necessary to explicate the grounds for decision.

At the pertinent times petitioner Roy William Harris was the president and chief executive officer of two corporations that I will on occasion collectively refer to as the "AroChem Companies" or "the Companies." One of these, AroChem International, Inc. ("International"), operated a petroleum and petrochemical refinery complex in Puerto Rico. The other, AroChem Corporation ("AroChem"), which maintained its principal offices in Greenwich, Connecticut, provided management services to International, including supervising the inventory and trading activities of International and marketing petrochemicals and petroleum products.

Harris was also the sole shareholder and managing director of a third entity, AroChem International, Ltd. ("Limited"), which engaged in trading and financing of crude oil and petroleum products.

In January of 1990 a consortium of banks, led by Chase Manhattan Bank, N.A. ("Chase"), and including Bank Brussels Lambert ("BBL"), Swiss Bank Corporation, Banque Indosuez ("BI"), and later, Skopbank (collectively "the Banks" or "the Chase Group of Banks"), entered into a revolving credit agreement ("the RCA") with the AroChem Companies. The RCA permitted the AroChem Companies to borrow up to $245 million as needed for their business operations. Loans made under the RCA were secured by the Companies' inventory of petroleum and petroleum products and by their receivables and cash. The initial credit agreement expired in January of 1991, and was extended thereafter six times through November 30, 1991. Ultimately the AroChem Companies defaulted on their obligations under the RCA. They owed the

Banks about $200 million when, on February 14, 1992, the Banks filed a petition to force the Companies into bankruptcy.

The government conducted a criminal and grand jury investigation, using the resources of the Office of the United States Attorney for this district and the FBI. The grand jury's indictment was filed on May 27, 1992.

To support its charges of conspiracy and substantive violations, the government alleged in the indictment a three-part fraudulent scheme: "conceal[ing] the true financial condition of the AroChem Companies from the Chase group of banks and the AroChem Companies' independent auditors"; misappropriations by Harris of "monies belonging to the AroChem Companies for his own personal benefit"; and "conceal[ing] from the Chase group of banks excessively speculative trading practices prohibited by the [RCA]." Indictment, ¶ 7.

According to the indictment, the first part of the fraudulent scheme consisted of creating false and fictitious contracts, invoices, receipts, wire transfers, and other documentation, including a series of "borrowing base reports" ("BBRs"), which were intended to identify the crude oil inventory and forward purchases of inventory by the AroChem Companies for refining at International's refinery in Puerto Rico.

The second part of the fraudulent scheme consisted of Harris engaging in petroleum product trading practices which repeatedly caused the AroChem Companies to hold net open positions far in excess of the one million barrel net trading position limitation imposed by the RCA, and concealing those trading practices from the Banks, with the result that Harris exposed the Companies and the Banks to excessive trading risk.

The third part of the scheme involved the diversion by Harris of assets belonging to the AroChem Companies to his personal accounts.

According to the government's theory of the case, Harris made use of Limited to perpetrate the scheme by utilizing Limited to finance oil cargoes in transit and other trading activities. Limited had accounts at Banque Paribas (Suisse) and Credit Lyonnais

(Suisse) in Geneva, Switzerland (the "Swiss Banks"). The government alleged that, in order to conceal and disguise the nature, location, source and ownership of funds, Harris transferred approximately $7.5 million from the AroChem Companies' accounts at Chase through the Union Trust Company in Connecticut and into Limited's accounts at the Swiss Banks, for the purpose of concealing from the Chase Group of Banks the extent to which Harris was utilizing Limited to finance cargoes in transit and trading activities.

The Second Circuit's opinion affirming Harris's conviction described these three components of the fraudulent scheme as "The Companies' Fraudulent Practices," "Violations of Financial Covenant," and "Money Laundering," respectively. 79 F.3d at 226–28.

In addition to the government's indictment of Harris, the AroChem Companies' default on their obligations under the RCA also generated a welter of civil litigation. I need not recite all the details. It is sufficient for present purposes to say that virtually everyone involved is suing everyone else: banks are suing Harris; banks are suing Ernst & Young, the AroChem Companies' independent auditors at the relevant times; banks are suing other banks; the AroChem bankruptcy trustee is suing banks; and so forth. I may not have referred to all the litigation pairings, but it does not really matter. Most of this litigation is pending in this district, consolidated before District Judge McKenna and Magistrate Judge Ellis, although cases are also pending in other courts.

The relevance of all this civil litigation to the case at bar is that the civil actions have, not surprisingly, generated vast amounts of pre-trial discovery, consisting of depositions and production of documents. Habeas counsel for Harris, who did not represent him at the trial, in post-trial proceedings, or on appeal, fasten upon this discovery as the basis for Harris's habeas corpus petition. "The extensive discovery in those civil law suits has disclosed that Mr. Harris's conviction was the result of perjury, false and misleading evidence, and suppression of testimony and evidence which would have exonerated

him." Initial affidavit of John B. Conway, Esq., sworn to on March 12, 1997, at ¶ 2. Counsel attaches to his affidavit as exhibits voluminous excerpts from depositions given during the civil litigation and many documents produced as exhibits.

Harris expands upon that theme in his main brief at 5:

> The facts upon which Harris was convicted, and the facts upon which his conviction was affirmed, are now provably false. As a result of massive discovery taken after Harris' trial in civil litigation brought by the RCA lenders, the real AroChem story has unfolded. Following the production of approximately four million pages of documents and the taking of depositions for approximately 400 days, the truth has come out. The truth is that Harris' conviction resulted from government misconduct which violated Harris' right under the fifth amendment to due process of law and a fair trial.

Since the petition at bar was filed, there have been a number of additional submissions of briefs and exhibits by counsel for Harris and for the government; a number of hearings before the Court at which counsel argued various points of law; the promulgation of written cross-interrogatories to an attorney formerly with the Harris defense trial team; an exchange of written requests to admit by counsel for Harris and the government's responses thereto; and the examination by the Court *in camera* of all the grand jury testimony in the case, as well as documents from the files of the government and the Milbank Tweed law firm, which represents Chase, counsel for Harris having sought to obtain discovery of such documentation in this proceeding. I have dealt with the issues arising out of that requested document discovery in opinions dated December 30, 1997, January 23, 1998, February 5, 1998, and March 6, 1998, familiarity with all of which is also assumed.

I now turn to a more detailed consideration of the various bases for relief that Harris urges in his petition.

PART IV. *Harris's Present Contentions*

Harris does not contend on this petition that the conduct of the AroChem Companies' business was entirely untainted by fraud. The principal contentions of habeas counsel are:

(1) The chief architect of any fraud perpetrated at AroChem was Vincent J. ("V.J.") Dispenza, the Companies' chief financial officer, aided and abetted primarily by Dean Seniff, the comptroller.[1]

(2) (a) Harris did not participate in any fraud at AroChem, and was unaware of any fraudulent acts on the part of his fellow corporate officers, Dispenza and Seniff.

(b) To the extent that Dispenza or Seniff testified that Harris knew or should have known of or participated in fraud at Aro-Chem, they committed perjury, and the government knew or should have known they were doing so.

(3) (a) Chase, and perhaps other members of the Chase Group of Banks, knew and approved of the AroChem Companies' practice of consistently holding a net unhedged position in oil greatly in excess of one million barrels, the covenanted limit in the RCA.

(b) To the extent that Bank witnesses at the trial testified that the one million barrel limit was vitally important to the Banks, and that the Banks did not know it was being exceeded, they committed perjury, and the government knew or should have known they were doing so.

(4) (a) Chase, and perhaps other members of the Chase Group of Banks, knew and approved of all oil trading activities engaged in by Limited with the financial assistance of the Swiss Banks.

(b) To the extent that Bank witnesses testified at trial that they were unaware of Limited's trading activities, and would have disapproved had they known, they committed perjury, and the government knew or should have known they were doing so.

---

1. Dispenza and Seniff testified for the government at trial under cooperation agreements. Dispenza was the principal government witness against Harris. Seniff corroborated Dispenza's testimony in various material respects.

(5) (a) Chase, and perhaps other members of the Chase Group of Banks, knew and approved of the full extent of Harris's speculative trading in oil futures.

(b) To the extent that Bank witnesses testified at trial that they were unaware of Harris's trading activities, and would have disapproved had they known, they committed perjury, and the government knew or should have known they were doing so.

(6) The trial testimony of the government's expert witness, Robert Lynch of the accounting firm of Arthur Andersen, with respect to the AroChem Companies' accounting records and the conclusions to be drawn from them, was perjurious, and the government knew or should have known that it was.

(7) The government violated its obligation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to advise Harris and his trial counsel of exculpatory material, and its obligation under *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), to advise Harris and his trial counsel of impeachment material.

(8) The government intimidated potential defense witnesses for the improper purpose of preventing them from testifying.

Trial counsel for Harris based his defense primarily upon contentions (1) and (2)(a). Harris did not testify at trial and the defense called no other witnesses. Trial counsel attacked the credibility of Dispenza and Seniff, and challenged the conclusions drawn by Lynch. Trial counsel did not attempt to demonstrate at trial, as habeas counsel now contend, that the Banks knew all along about the Companies' exceeding the one million barrel net open position limit, or about the speculative oil trading activities of Limited and Harris.

With the issues thus posed, the Court directed counsel to address the question whether, in addition to the hearings previously conducted, the circumstances of this case required an evidentiary hearing to which witnesses would be called to testify.

Harris and the government both take the position that no evidentiary hearing is necessary, but for diametrically opposite reasons. Harris contends that the present record entitles him to habeas relief and a new trial. The government contends that the present record requires dismissal of the petition. Counsel have briefed these contentions and argued them at the most recent hearing. Thus the present procedural posture of the case is analogous to cross-motions for summary judgment.

PART V: *The Requisite Showings to Establish that Evidence is "Newly Discovered"*

It frequently occurs that petitions for habeas corpus under § 2255 and motions for a new trial under Rule 33 are based upon what the applicants characterize as "newly discovered evidence." Indeed, in the case at bar, that is a central theme stressed by habeas counsel for Harris, who contend, as noted, that the truth as they perceive it emerged only during the course of the civil litigation that followed the criminal trial.

The question therefore arises: what must be shown to qualify evidence as "newly discovered?" I address that question in this Part of the Opinion.

That question is often presented in the context of allegedly perjured trial testimony, and so I begin the analysis with such cases.

*Perjury*

Harris contends that the government knowingly presented perjured testimony and false evidence going to material issues. Without that perjured testimony, Harris argues, he could not have been convicted on any component of the fraudulent scheme charged against him. In those circumstances, Harris concludes, he is entitled to relief on two grounds. First, this corruption of the fairness of the trial process violated his Fifth Amendment right to due process of law, a claim cognizable under the habeas statute, 28 U.S.C. § 2255, which covers cases where a federal sentence was imposed "in violation of the Constitution or laws of the United States." Second, perjured prosecution testimony is a recognized ground for a new trial under Rule 33, Fed.R.Civ.P.

There is authority that supports both grounds urged by Harris. As for the habeas statute, in *Mooney v. Holohan*, 294 U.S. 103,

112, 55 S.Ct. 340, 79 L.Ed. 791 (1935), upon which Harris places principal reliance, the Supreme Court made it clear that "if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured," that conviction must be regarded as "inconsistent with the rudimentary demands of justice ... "[2] *Mooney* construed the Due Process Clause of the Fourteenth Amendment to the United States Constitution. More recently the Court has said, in a case construing the Due Process Clause of the Fifth Amendment, which "will apply equally to the comparable clause in the Fourteenth Amendment applicable to state trials," that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have effected the judgment of the jury ... " *United States v. Agurs,* 427 U.S. 97, 103–04, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

In the Rule 33 context, the government's use of perjured testimony, knowing or unknowing, is a commonly urged basis for a new trial under the rule. Each case turns on its own circumstances. Sometimes the motion succeeds, as in *United States v. Wallach,* 935 F.2d 445 (2d Cir.1991); sometimes it fails, as in *United States v. Torres,* 128 F.3d 38 (2d Cir.1997).

█ In the most recent round of briefing, I directed counsel to address the question whether, to succeed on the basis of either statute or rule, Harris must show not only that the government obtained his conviction by the knowing use of perjured testimony, but also that he and his counsel were unaware of the facts demonstrating the perjury at the time of trial, and could not have discovered them by the exercise of due diligence. I now conclude that the question must be answered in the affirmative, in the contexts of both statute and rule.

█ Treating those contexts in inverse order, analysis of what must be shown to obtain a new trial begins with the wording of Rule 33. The rule provides in pertinent part:

A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within 7 days after verdict or finding of guilty or within such further time as the court may fix during the 7–day period.

These time limits are jurisdictional. Given the chronology of the case, "the ground of newly discovered evidence" is the only Rule 33 ground available to Harris, and that is the ground he urges, purportedly based, as noted *supra,* upon post-trial revelations in the civil litigation.

"Newly discovered evidence," as that phrase is used in Rule 33, has a well-established meaning in the Second Circuit. A recent expression appears in *United States v. Torres,* 128 F.3d 38, 48–49 (2d Cir.1997): "When a motion for a new trial rests on newly discovered evidence, the defendants must show: (1) that, with due diligence, they could not have discovered the evidence during trial; (2) that the evidence is material; and (3) that the evidence is non-cumulative" (citations omitted).

The defendants in *Torres,* as does Harris, based their Rule 33 claim upon perjury by a government trial witness. The *Torres* defendants had no difficulty satisfying the due diligence requirement, since it was not until their original motions for new trials were pending that "the government notified the court and [defendants] that one of its witnesses had committed perjury at trial. The government learned that this witness had withheld from the government about $80,000 in cash proceeds from his heroin business, in

**2.** *Mooney* arose on a state prisoner's motion for leave to file an original writ of habeas corpus petition in federal court. The Supreme Court denied that motion "without prejudice" on the ground that habeas relief should first be sought

in the state courts. 294 U.S. at 115, 55 S.Ct. 340. That procedural circumstance is not presented in the case at bar, and the principles of fairness articulated in *Mooney* continue to resonate today.

direct contradiction to his trial testimony that he had not hidden any money." 128 F.3d at 48. *United States v. Moore*, 54 F.3d 92, 99 (2d Cir.1995), presents the same circumstance ("Moore learned of the alleged perjury only during a fortuitous post-trial conversation with Timothy Cyrus' counsel in a separate proceeding."). In both *Torres* and *Moore*, it was apparent that the Rule 33 movant claiming perjury by a government witness did not know, and could not have known, of the perjury at the time of trial.

However, contrary to Harris's contention, where at the time of trial a Rule 33 movant knew or by the exercise of due diligence could have discovered (and consequently demonstrated) a government witness's perjury, he cannot satisfy the first of the three requirements articulated in *Torres*, and the evidence of perjury is not "newly discovered" under the rule. In *United States v. Helmsley*, 985 F.2d 1202, 1206–08 (2d Cir.1993), the Second Circuit explained:

> Normally the requirement that a collateral attack must be supported by evidence not available by reasonable diligence at trial applies to claims of a prosecutor's knowing use of false testimony .... We have never permitted a successful collateral attack for a prosecutor's knowing use of false testimony based entirely on evidence of which the defendant was aware, or in the exercise of reasonable diligence should have been aware, at trial, and we have permitted such an attack to succeed, despite the existence at trial of some basis for the defendant to suspect the prosecutor's knowing use of false testimony, only where the prosecutor was directly involved in the falsity.[3]

In *United States v. White*, 972 F.2d 16 (2d Cir.1992), the Second Circuit said in the context of a motion for a new trial based on perjured testimony that "the motion will not

be granted unless the 'newly discovered evidence' could not with due diligence have been discovered before or during trial." · 972 F.2d at 20. While the court did not deny the motion on that ground, *id.* ("[s]ince it is not the use of the drugs but the alleged denial of use that would make this evidence material, it is difficult to evaluate whether defense counsel could have, or should have, developed this point prior to Smith's testimony"), *White* makes it clear that in this circuit, the due diligence requirement applies to Rule 33 motions for a new trial based upon the perjury of government witnesses.

■ I conclude that the same requirement applies to statutory habeas corpus petitions based upon trial perjury. In that context Harris places primary reliance upon *Mooney v. Holohan, supra*, but fails to quote in his briefs this passage from the Court's *per curiam* opinion:

> [Petitioner] alleges that he could not by reasonable diligence have discovered prior to the denial of his motion for a new trial, and his appeal to the Supreme Court of the State, the evidence which was subsequently developed and which proved the testimony against him to have been perjured.

294 U.S. at 110, 55 S.Ct. 340. While as stated at footnote 2, *supra*, in *Mooney* the Supreme Court did not pass upon the merits of the petition, on the ground that it must first be presented to the state courts, there is no reason to suppose that the petitioner would have alleged his exercise of due diligence or the Court have explicitly referred to it, if due diligence was not an essential requirement for relief.

In *United States v. Agurs, supra*, which reached the merits and turned upon the Due Process clause of the Fifth Amendment, the parties litigated the due diligence issue. *See* 427 U.S. at 101, 96 S.Ct. 2392 (the govern-

---

**3.** In *Helmsley* the Second Circuit distinguished a number of cases, including *United States ex rel. Washington v. Vincent*, 525 F.2d 262 (2d Cir. 1975), *cert. denied*, 424 U.S. 934, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976), and *United States v. Valentine*, 820 F.2d 565 (2d Cir.1987), as "creat[ing] at most a limited exception to the normal requirement of due diligence with respect to collateral attacks based on a prosecutor's knowing use of false testimony." 985 F.2d at 1207. The

*Helmsley* court continued: "In *Washington*, the new evidence was the prosecutor's statement at the sentencing of the witness that a deal had been struck. In *Valentine*, the new evidence was the grand jury transcript, which had been unavailable to the defendant prior to or during his trial and which confirmed his suspicions that the prosecutor had misrepresented grand jury testimony." *Id.* at 1208.

ment, opposing relief, argued *inter alia* "that the evidence was readily discoverable in advance of trial and hence was not the kind of 'newly discovered' evidence justifying a new trial"); *id.* at 102, 96 S.Ct. 2392 (the court of appeals "found no lack of diligence on the part of the defense"). While *Agurs* involved a claim of prosecutorial nondisclosure of exculpatory evidence, rather than use of perjured testimony, there is no principled reason to apply the due diligence requirement in one context but not in the other; and *Agurs* cites *Mooney* as one of three situations which "involves the discovery, *after trial,* of information which had been known to the prosecution but unknown to the defense." *Id.* at 103, 55 S.Ct. 340 (emphasis added).

In addition to *Mooney v. Holohan,* Harris cites *United States v. Wong,* 78 F.3d 73 (2d Cir.1996), and *United States v. Gambino,* 59 F.3d 353 (2d Cir.1995), to support the contention "[t]he knowing use of false testimony compels the reversal of a conviction." Brief of Petitioner for Judgment Setting Aside his Conviction Based Upon the Evidence Before the Court at 32. That contention materially overstates the holdings of these cases, both of which assumed governmental use of perjured testimony but denied new trials. *See Wong,* 78 F.3d at 82 ("The circumstances do not suggest that the undisclosed evidence of Teixeria's perjury would have affected the result."); *Gambino,* 59 F.3d at 365 ("Even assuming Gravano perjured himself and assuming perjury in other trials would be relevant to Gravano's testimony in this trial, we do not believe the *Conte* letter material in the constitutional sense. Had defense counsel had access to the letter, we do not believe it would likely have affected the outcome of the trial ... "). But more pertinent to the present discussion, it is apparent from both *Wong* and *Gambino* that the evidence relied upon to establish perjury was truly "newly discovered" by the defense. The perjury of the paid informant Teixeria in *Wong* arose out of inconsistent testimony about his tax returns, given in prior unrelated cases of which the prosecutor had knowledge but defense counsel had none. The "*Conte* letter"

referred to in *Gambino* constituted *Brady* material which the Second Circuit said should have been made available to the defense. There is nothing in either of these cases, or indeed in any other, to suggest that the evidence used in a post-trial motion to demonstrate trial perjury need not be newly discovered.

The policy reason for that requirement is plain enough. A defendant must use available evidence to attack the credibility of government witnesses at trial. He cannot fail or omit to do so at trial and then, in the event of a conviction, use such evidence to mount a collateral attack upon it. Were the rule otherwise, the finality of judgments would be compromised and litigation could be endless.

*United States v. Siddiqi,* 959 F.2d 1167 (2d Cir.1992), reflects the operation of that policy. This was a prosecution for Medicare fraud. The decisive question of fact was whether the defendant, a physician, prepared the fraudulent claims forms. Defendant said he could not have done so because he was out of the country at the times the forms underlying the counts of conviction were completed. Following his conviction by the jury, defendant moved under Rule 33 for a new trial, proffering as newly discovered evidence a hospital "physicians away list" which tended to show that defendant was indeed away from the hospital on the key dates. The district court denied defendant's Rule 33 motion. On direct appeal, the Second Circuit remanded the case for further proceedings with respect to this evidence. The court of appeals concluded that if the document in question had been before the jury, "the jury probably would have acquitted Siddiqi on the five counts which are the subject of his appeal." *Id.* at 1172. But the court of appeals did not order a new trial; rather, it remanded the case to the district court for further proceedings to determine whether the document qualified as "newly discovered" evidence, and was admissible.[4] The Second Circuit's instructions on remand are noteworthy:

---

4. In denying defendant's Rule 33 motion, the district court "pass[ed] over the issue of whether the evidence could have been discovered before

or during trial with the exercise of due diligence," 959 F.2d at 1172.

On remand, the district court should determine (1) whether the document could have been discovered before or during trial with the exercise of due diligence, and (2) whether the document is admissible into evidence. If it could have been discovered, or if it is not admissible for lack of authenticity or other reasons, then the convictions shall stand, since we find Siddiqi's challenges to the jury charge meritless. However, if the document is both new and admissible, then in light of our conclusion that it probably would have led to an acquittal if presented to the jury, the district court shall order a new trial on counts 31, 33, 40, 42, and 43 of the indictment.

*Id.* at 1174.

*Siddiqi* thus holds that even if a defendant proffers evidence on a Rule 33 motion that would probably have resulted in acquittal, it avails him nothing if "the evidence could have been discovered before or during trial with the exercise of due diligence."

For the reasons set forth above, I hold that, whether the procedural context be a petition under § 2255 or a motion under Rule 33, the perjury of a government witness cannot be a ground for successful collateral attack upon a conviction unless the defendant shows that the facts demonstrating that perjury were not known to the defense at trial, and could not have been discovered by the exercise of due diligence.

*Documentary Evidence*

■ Habeas counsel for Harris also claim that documentary evidence exists which, if called to the attention of the jury, would have led to a different trial result.

I think it is plain that, even if such claims are not coupled with charges that government witnesses perjured themselves, they stand upon the same footing with respect to newly discovered evidence. That is to say, documents cannot be so characterized, and consequently cannot form the basis for habeas or Rule 33 relief, unless the applicant can show that the documents in question were not known to the defense at trial, and could not have been discovered by the exercise of due diligence.

I will now apply these holdings to certain of the claims Harris asserts in this proceeding.

### PART VI: *The One Million Barrel Covenant*

■ In its opinion affirming Harris's conviction, 79 F.3d at 227, the Second Circuit summarized the evidence on this aspect of the fraudulent scheme the government charged against Harris:

> The agreement between the AroChem Companies and the banks prohibited the Companies from holding a net unhedged position in oil of more than one million barrels. However, the Companies regularly violated this covenant. For instance, the Companies' net unhedged position was in excess of one million barrels approximately 80% to 85% of the time during the period January, 1990 through January, 1991. By November of 1990, the AroChem Companies were maintaining net unhedged positions of up to 10 million barrels of oil. The Companies never informed the banks that they were engaged in such highly speculative trading.

Habeas counsel for Harris correctly assert that witnesses employed by the Banks gave material evidence in support of these propositions. They were Suzanne Durney and Michiel van der Voort, employees of Chase, and Alexander "Sasha" Dinell, an employee of BBL. Of these, Durney was the most important witness, and is the witness against whom habeas counsel assert the most vehement accusations of perjury.

Durney testified that the net open position covenant was a very significant issue for Chase, intended to insure that AroChem was not entering into speculative positions, which the Banks wished to prevent lest the Companies' capital base be exposed to the volatility of the oil markets; that she relied upon the BBRs to make sure that the Companies were in compliance with the net open position covenant; and that she never knew that AroChem had net open positions exceeding one million barrels. Durney testified that Chase "relied very heavily" on the information in the BBRs, "to insure that the company had sufficient collateral to support the loans and to insure that the company was not violating

its trading net open position." Trial Tr. 494. She testified further that Chase was never told that the Companies "had positions as much as 10 or 15 million barrels long or short"; and that "[i]f we had known that the company was taking those kinds of positions, we never would have made the loan in the first place. If we had found out after we made the loan, we probably would have demanded payment and probably would have tried to foreclose on our collateral." *Id.* at 546–47.

Dinell and van der Voort gave consistent testimony with respect to the importance of the covenant, the use the Banks made of the BBRs, the reliance placed upon them, and the Banks' ignorance of the Companies' net unhedged open positions.

It is useful now to describe in more detail the RCA's one million barrel covenant and the information contained in the BBRs.

RCA § 8.22 provided that the AroChem Companies "would not permit their Net Open Position at any one time to exceed 1,000,000 barrels if their Net Open Position is a positive number, or less then a negative 1,000,000 barrels if their Net Open Position is a negative number." RCA § 1.01, captioned "Certain Defined Terms," defined "Net Open Position" as meaning "the number of barrels equal to (i) the sum of the volumes of: (a) Inventory [excluding certain substances] and (b) Inventory that the Obligors are obligated to purchase under Forward Contracts or Futures Contracts or that the Obligors have the right to purchase under Call Options," minus "(ii) the sum of the volumes of Inventory that the Obligors are obligated to sell" under such contracts or "have the right to sell under Put Options."

The BBRs which AroChem filed with Chase on a near-weekly basis purported to show the Company's current trading positions. Such a document was called a "Borrowing Base Certificate," to which a "Position Report" was attached. The parties' briefs telescope these captions, referring to the document as a "borrowing base report," and so will I; hence the abbreviation "BBR."

The BBRs do not contain the phrase "Net Open Position," which as noted appears in the RCA. Rather, the BBRs conclude with the notation "NET INV. POS.," which Durney testified in her analysis of a typical BBR, for May 26, 1991, GX 59, showed that "the Company on this particular date was long 598,000 barrels of inventory." Trial Tr. 492. In other words, on the government's trial theory the entry for "NET INV. POS." represented the net open position specified by the covenant in RCA § 8.22 and defined in RCA § 1.01.

The BBRs typically listed "forward purchases of inventory" which were marked "variable." Durney testified that such contracts "were not included in the long position of the company because they don't put the company at any price risks, since the prices on these barrels hadn't been set." Trial Tr. 485. If "variable" contracts were included in AroChem's long position, then every BBR would show a net open position greatly in excess of the one million barrel limitation.

The contention now put forward by Harris's habeas counsel (although not by his trial counsel) is that "variable" forward purchases of inventory should have been included in the long position and that Durney knew this. If the BBRs are read in that fashion, they consistently showed non-compliance with the covenant. Accordingly, the habeas argument proceeds, Durney's trial testimony on the point constituted perjury, as the government knew or should have known. The bottom-line contention for Harris in this proceeding is that Chase knew Harris and AroChem were speculating in oil futures, went along with it gladly, and then needed to set up Harris as a scapegoat when AroChem lost heavily and defaulted on the loans. In short, habeas counsel contend, the Banks were not defrauded with respect to the Company's non-compliance with the net open position covenant, as the government charged in the indictment.

Moreover, habeas counsel contend, the excessive net open positions should have been readily apparent to "anyone who knew how to read the borrowing base reports." Reply Brief at 30. That is because "[t]his precise phenomenon appeared on every single borrowing base report given to the RCA lenders under the RCA; that is, on every single

borrowing base report the number of barrels shown next to 'NET INV. POS.' did not include the barrels listed for contracts listed 'variable' but on which the price was fixed." *Id.* at 32.

While in this proceeding Harris charges the government with failing to produce or identify certain documents in violation of its *Brady* and *Giglio* obligations, *see* Part X, *infra,* there appears to be no doubt that the BBRs were furnished to the defense team prior to trial, and were in fact admitted as exhibits at trial. Thus as enclosures to a letter dated June 4, 1992, Assistant United States Attorney Howard M. Shapiro sent to lead counsel for Harris "[t]he borrowing base certificates and attached position reports to the Chase Group of Banks by the AroChem Companies between April 1990 and December 1991." Shapiro Affidavit Ex. A. This occurred five months before the trial began, the jury having been empaneled on November 9, 1992. Any lingering doubt on this point was dispelled during oral argument on the motions for summary disposition on February 2, 1998. Habeas counsel for Harris had just finished discussing what the BBRs show about net open positions, reiterating the claim that Dispenza and Durney had perjured themselves in their relevant testimony. *See* Tr. 127, 138. In order that I might fully understand the evidentiary basis for that contention, I put a question to counsel for Harris:

> THE COURT: All right. I guess all I'm really getting at and the question I just put to you was whether we call it perjury or misrepresentation or artful dodging or misleading or whatever, the evidence which you now say brands this testimony as one or the other is evidence which, in order to make the argument, you must demonstrate to be newly discovered evidence under Rule 33. Do you accept that proposition?

> MR. CONWAY: Newly discovered *within the evidence—within actual exhibits and testimony at trial,* your Honor.

> THE COURT: Okay. All right.

> MR. CONWAY: I will not refer, I don't believe, *I don't think I will be referring to anything that wasn't either an exhibit or testimony at trial.*

Tr. 138–39 (emphasis added).

This acknowledgment gives the game away with respect to this aspect of the case. How evidence "newly discovered within the evidence" adduced at trial can be "newly discovered evidence," as that phrase is used in habeas and Rule 33 cases, passes all understanding. The most that can be said for Harris, with respect to the one million barrel covenant, is that his present counsel are advancing arguments based upon trial exhibits which trial counsel might have made but did not. That cannot possibly fit within the rubric of newly discovered evidence, as the Second Circuit held in the closely analogous case of *United States v. Slutsky,* 514 F.2d 1222 (1975).

The defendants in *Slutsky* were convicted of attempted income tax evasion in connection with their operation of the Nevele, a Catskills resort hotel. After affirmance of their conviction on direct appeal, the defendants moved for a new trial under Rule 33 on the basis of newly discovered evidence. That evidence came to the attention of new attorneys engaged to prepare a petition for a writ of certiorari to the Supreme Court. "While conducting an independent examination of the facts relating to their clients' case, the lawyers came across financial statements of the Nevele Acres, another enterprise owned and operated by the Slutskys." 514 F.2d at 1224. The transactions between the hotel and this second enterprise gave rise to a potential explanation for the discrepancy between the size of bank deposits and reported income, upon which the government had based its charge of tax evasion. But the Second Circuit held, affirming the district court, that such evidence could not qualify as "newly discovered" under the rule:

> In short, although the new attorneys retained by the Slutskys may have uncovered evidence that seemed startling to them, there is no doubt that their clients knew, or at the very least with the exercise of due diligence should have known, of the existence of any such exculpatory evidence and its ramifications. It is far too late for seasoned businessmen with a thorough

knowledge of their operations and access to all pertinent records to claim that they were unable to comprehend the nature of the case against them or to decide what evidence might be helpful to their cause. Had the appellants and their able trial counsel been inclined to present the evidence which is now claimed to be "newly discovered," they clearly had the tools to do so at the time of the trial. One can only speculate why they did not. Perhaps they did not care to subject the other Slutsky enterprise to audit.

*Id.* at 1225–26: *see also United States v. Parness,* 408 F.Supp. 440, 443 (S.D.N.Y.1975) (where, following conviction for acquiring control of casino-hotel through a pattern of racketeering, defendants moved for new trial under Rule 33 on ground that a government trial witness modified his trial testimony at a subsequent civil deposition, but deposition testimony relied upon work sheets received as government exhibits at criminal trial, "[d]efendants' present calculations and conclusions are based solely on the same exhibits and do not constitute newly discovered evidence.").

In the case at bar, Harris seeks to avoid the thrust of the common-sense analysis of such cases by contending, through his habeas attorney's offer of proof, that "he did not review the borrowing base reports and that he did not understand them at the trial," Offer of Proof at ¶ 7; that he "devoted virtually all of his time to opportunistic trading and did not spend time preparing or reviewing AroChem's reporting requirements under the RCA, all of which he delegated to Dispenza, as AroChem's Chief Financial Officer," *id.;* that "he did not understand, until the trial, that the government, through Durney, Dispenza, and Lynch would claim that NET INV. POS. on the BBRs was supposed to be the same as net open position as defined in the RCA," ¶ 8; that the facts revealed by the BBRs "were not apparent to Harris and would not have been apparent to anyone other than a person like Durney with a detailed knowledge of the RCA," ¶ 19; and that "as a result of the government's seizure of his assets before trial, he did not have the funds necessary to retain an accountant to assist in his trial preparation although he sought to retain an accountant," ¶ 11.

This proffered testimony by Harris is entirely insufficient to qualify his present contentions as based upon newly discovered evidence. The protestation of the president and chief executive officer of a corporation that he could not understand operating inventory documents generated by that corporation is inherently implausible. But I do not decide the issue on that basis because, even assuming that Harris never understood the RCA, never saw the BBRs while AroChem was generating them, and remained baffled by the RCA and the BBRs during the five months prior to trial and the five-week trial, there were resources available to him to make the confrontational arguments which habeas counsel now makes: namely, Harris's experienced trial counsel, and a forensic accountant if trial counsel could not understand these documents either.

I can give no weight to Harris's assertion that he could not afford to hire an accountant. Defendants who as the result of governmental seizure of their property cannot afford the costs of their defense routinely apply to the trial judge for a partial release of assets; trial judges routinely grant such applications; and Harris made no such application to this Court. In addition, prior to sentencing I held a five-day evidentiary hearing to evaluate Harris's claim that I should depart downward from the Sentencing Guideline range because he suffered from a diminished mental capacity due to a pathological gambling disorder. *See* United States Sentencing Guidelines § 5K2.13. At that hearing Harris was represented by new counsel (who also represented Harris on appeal but not in this proceeding) who has a very considerable reputation at the Bar; the presumption arises that he did not represent Harris *pro bono.* In addition, Harris called as a witness at the sentencing hearing an expert in gambling addiction who had examined Harris and submitted a lengthy written report, and whose services are subject to the same economic presumption. In these circumstances, I find it impossible to accept the suggestion that at a trial upon which his liberty depended, Harris lacked the re-

sources to retain the services of a forensic accountant. But even if Harris suffered to that extent from financial deprivation, he could have applied for relief to the trial court.

The briefs of counsel debate at length the proper definition of "Net Open Position" under the RCA and what the BBRs show or do not show on that subject. I need not resolve those issues, because assuming everything that Harris says is correct, the documents with which to confront and confound Dispenza, the Banks' witnesses, and Robert Lynch (the government expert witness who prepared a chart to reflect the net open position as shown on the BBRs) were trial exhibits, and had been furnished to the defense five months before the trial began.

Accordingly Harris's present contentions with respect to the one million barrel covenant cannot be characterized as based upon newly discovered evidence. In no discernible way are those contentions based upon evidence first generated by the subsequent civil litigation. They are based instead upon trial exhibits whose import would be apparent, in the phrase of habeas counsel, to "anyone who knew how to read the borrowing base reports"; and assuming *arguendo* that Harris and his trial counsel all failed that literacy test, resources were available to meet the need.

In these circumstances, I need not reach the questions of whether the testimony in question was perjurious, or if so, whether it was material in the constitutional sense.

Harris is not entitled to habeas or Rule 33 relief on this aspect of the case.

PART VII: *The Activities of Limited*

█ Harris created Limited in October 1990 and was its sole shareholder. The indictment charged that Harris availed himself of Limited in order to further two aspects of the fraudulent scheme.

### 1. *Misappropriation of AroChem's Funds*

In Count One, the conspiracy count, the indictment alleged at ¶ 7 that "[a]s a further part of this scheme, Harris incorporated monies belonging to the AroChem Companies for his own personal benefit." The manner in which he did so was more particularly described in ¶ 12, captioned "Fraudulent Diversion of Funds," which read:

> As a further part of the scheme, the defendant ROY WILLIAM HARRIS, a/k/a "Will Harris," with the assistance of the other officers and employees of the AroChem Companies, also diverted assets belonging to the AroChem Companies to his personal accounts. On four occasions between June and October 1991, at a time when Limited owed money to the AroChem Companies, HARRIS transferred a total of approximately $3.7 million from Limited's accounts in Switzerland to HARRIS'S personal account at the Bank of New York. The amount transferred from Limited to HARRIS far exceeded Limited's net equity at the time.

The flow of funds from Limited's accounts in the Swiss Banks to Harris played a vital part in the government's prosecution of Harris for conducting a continuing financial crimes enterprise ("CFCE") in violation of 18 U.S.C. § 225 (the so-called "Kingpin statute"). The government was required to prove, *inter alia*, that Harris "receive[d] $5,000,000 or more in gross receipts from such enterprise during any 24-month period." § 225(a)(2). The government offered proof at trial to the effect that during the period from April 1990 through December 1991, Harris received a total of $7,333,758 in funds generated by the AroChem Companies and Limited, of which $5,718,709 came from Limited: $4,875,089 paid to Harris, and $843,620 paid to Starwood Corporation, which sum the government argued should also be ascribed to Harris. The government characterized these payments as a diversion of AroChem funds to Harris, thereby defrauding the RCA Banks, because at that time, on the government's theory, Limited owed comparable amounts to AroChem. Specifically, Robert Lynch, the government's expert accounting witness, testified that on the basis of his examination of the documents available to him, as of November 30, 1991 the AroChem Companies "were owed approximately 4.3 million" by Limited. Trial Tr. 2536.

### 2. Concealment of AroChem's Speculative Trading

Secondly, the government offered proof purporting to show that Harris used Limited and the Swiss Banks to finance AroChem's speculative oil trading while concealing that trading from the Chase Group of Banks. In its opinion on direct appeal the Second Circuit identified that aspect of the case as "Money Laundering," and summarized the government's evidence as follows:

In October of 1990, Harris formed a new company, AroChem International, Ltd., ("Limited") in order to gain financing to support a contract that the companies had entered into with the Nigerian government and to assist the Companies with financing when their credit became tight. The banks were aware of Limited's formation and were informed that Limited would be financed by Credit Lyonnais and Banque Paribas of Switzerland (together, the "Swiss Banks"). However, the banks required the Companies to obtain their permission before entering into financial transactions with Limited.

From October of 1990 through December of 1991, the Companies entered into numerous transactions with Limited without seeking the banks' permission. By the summer of 1991, the Swiss Banks were financing $100 to $200 million of the Companies' trading in oil markets. Dispenza testified that he and Harris discussed how such financing violated the agreement's financial covenants.

As a condition to providing financing, the Swiss Banks required a cash deposit as margin before they would issue letters of credit to finance Limited's transactions. According to Dispenza, in order to supply the cash, Dispenza and Harris decided to move money from the Companies' accounts at Chase Manhattan Bank, N.A. ("Chase") n New York to their accounts at Union Trust Company ("Union Trust") in Connecticut, and then transfer the funds to the Swiss Banks. The purpose of routing the money through Connecticut was to conceal from the banks that the financing they were supplying was being used by the Companies to acquire additional financing

from the Swiss Banks. From April of 1991 through September of 1991, excluding the amount used for operating needs, $7,420,-000 was moved from Chase to Union Trust, and $7,723,344.90 was then moved in the same period from Union Trust to the Swiss Banks. The Companies never informed the banks of these transactions.

79 F.3d at 227–28.

This proof formed the basis for Count Nine of the indictment, charging money laundering in violation of 18 U.S.C. § 1956(a)(2), and for Counts Ten through Twenty-one, each charging wire fraud in violation of § 1343 and referring to a particular transfer of funds between AroChem's Chase and Union Trust accounts during the period April 12 through September 19, 1991.

### Harris's Present Contentions

As to the first of these fraudulent uses Harris made of Limited, habeas counsel contend that Limited was not indebted to the Companies at the time of Limited's payments to Harris; and that those payments represented legitimate trading profits earned by Limited, to which Harris was entitled as Limited's sole shareholder.

As to the second, habeas counsel contend that the transfers from Union Trust in Connecticut to Limited's Swiss Banks were of a legitimate commercial nature; and that the witnesses from the Chase Group of Banks, principally Durney and Dinell, committed perjury when they denied knowledge of Limited's extensive oil trading activities.

Placing aside for the present Harris's charges of perjury against the Bank witnesses, the problem he faces with the rest of these contentions is that he cannot show they are based upon newly discovered evidence.

As previously noted, the focal point of Harris's contention that Limited was not indebted to AroChem at the time Limited made payments to Harris is the asserted perjury of Lynch, the government's expert accounting witness, who testified to the contrary. The accessibility of pertinent documents to Harris and his trial defense counsel is discussed more fully under Part X, *infra*, in the context of the claims of habeas counsel that the government violated its *Brady* and *Giglio*

obligations. For present purposes it is sufficient to say that, as demonstrated in that discussion, Harris and his trial defense team had access to all the documents that would have permitted them to challenge Lynch's testimony and economic calculations in the respects that habeas counsel now undertake to do.

Several quotations from Harris's most recent brief, in support of summary disposition,[5] will suffice to make the point. Harris argues, SDB at 72, that "[t]here was no document introduced at trial which even suggested that [Limited] owed AroChem $4.3 million as of 11/30/91 or at any time thereafter." Assuming *arguendo* the truth of that assertion, no reason appears why trial counsel could not have confronted Lynch with that lack of documentation on cross-examination.

It is also said that "[t]he government did not designate as *Brady* material the 9/30/91 balance sheet of [Limited] which showed no debt owed to AroChem." *Id.* at 74–75. Since the government made "open file" pretrial discovery of all its AroChem files available to Harris, *see* Part X, *infra,* and Harris also had access to any additional AroChem documents in the hands of the Companies' bankruptcy trustee, there is no reason to suppose that this document was not available to or discoverable by the defense for whatever purpose it might have served at trial.[6] It is also said that "[a] document from AroChem's files indicates that, as of 12/31/91, *AroChem owed [Limited]* $6,719,356.78." *Id.* at 75 (emphasis in original). While this document might have been used by the defense to confront Lynch at trial, under the rationale of a case such as *Slutsky, supra,* it is difficult to characterize it as newly discovered evidence.

It is also said that "[a]lthough Lynch testified that the $4.3 million debt was still owing as of the date of his testimony in December 1992, *he and the government knew* that, in February 1992, BPS had transferred from [Limited's] account to AroChem's account at Chase the sum of $2.3 million in settlement of an interpleader action filed by Chase," which amount, according to Harris's habeas argument, should be applied to reduce the $4.3 million indebtedness from Limited to AroChem testified to by Lynch. *Id.* at 74 (emphasis added).[7]

The implication in this assertion, that Harris did not know what "[Lynch] and the government knew" about this transaction, is baffling. The document Harris cites in support of the assertion, Conway Ex. 190, consists of a Settlement Agreement dated as of February 4, 1992, and Stipulations of Settlement attached thereto as exhibits, which disposed of several statutory interpleader actions arising out of contracts AroChem Corporation entered into to purchase and sell West Texas Intermediate Crude Oil. Chase (as "Intercreditor Agent" for the Chase Group of Banks) and BPS had each claimed that, in respect of those contracts, its security interest and other claims were superior to the other's. The Agreement and its attached Stipulations were signed on behalf of AroChem Corporation and (on some documents) also on behalf of AroChem International, Inc. by Gregory B. Classon, the AroChem Companies' General Counsel and Secretary. Presumably Classon was known to Harris, the CEO of the Companies, and obtained Harris's authority before signing these significant legal documents. And so the same obstacle to habeas relief arises: whatever the potential utility of these transactions in challenging Lynch's testimony, they were surely fully known to Harris or discoverable by him at the time of

---

**5.** I will hereafter refer to that brief as the "SDB."

**6.** The complaint of Harris's habeas counsel that the government "did not designate as *Brady* material" this particular document sounds a theme upon which variations are played throughout the present briefs and oral arguments for Harris. As more fully developed under Part X, *infra,* Harris's contention *au fond* is that the government should have anticipated arguments that trial

counsel did not make but habeas counsel now make, and, thus guided by clairvoyance, should have, prior to or during trial, designated as *Brady* or *Giglio* material documents which arguably support contentions that lay in the uncharted and unknowable future.

**7.** "BPS" stands for Banque Paribas (Suisse), one of the Swiss Banks which, it will be recalled, made loans to Limited to finance Limited's oil trading activities.

trial, and so cannot be characterized as newly discovered evidence.[8]

To the extent that Harris's habeas petition relies upon documentary evidence to justify the transfers of funds to him, in derogation of the money laundering accusation, the same problem is present. The problem is illustrated by the contentions habeas counsel make on the point. They argue:

> The internal accounting and wire transfer records of AroChem, combined with the documents produced by CLS[9] and BPS pursuant to the government's request for judicial assistance, prove that the total amount transferred to the two Swiss banks by AroChem was $7.4 million. These documents also prove that the Swiss Banks transferred back to AroChem approximately the same amount of money.

> Indeed, during the very period reflected on GX 1021 [a government trial exhibit for which habeas counsel reserve particular scorn], there were transfers back from the Swiss Banks to Union Trust and then to Chase of sums equal to or greater than the sums Harris was allegedly siphoning out of AroChem behind Chase's back. For example, GX 1021 shows transfers from Chase to Union Trust to CLS of approximately $670,000 on April 12, 1991. However, it doesn't show that, on April 2, 1991, [Limited] had transferred from its account at CLS to Union Trust the sum of $573,459, and that, on the same day, AroChem had transferred that precise amount back to Chase. AroChem Corporation's bank statement from Chase explains that entry as a "Brent bookout." Similarly, GX 1021 fails to reflect a July 3, 1991 entry on the Chase statement for AroChem International, Inc. of a transfer from Union Trust of $500,000 with an explanation "Brent bookout." *The government does not deny that it knew of these entries on the Chase statements.*

SDB at 68 (emphasis added; citations to exhibits omitted). But no more can habeas counsel deny that *Harris* knew of or had trial access to these entries on the statements of the AroChem Companies' own banks: its lender, Chase, and its regular commercial bank, Union Trust; or CLS and BPS, the Swiss Banks that served Limited.[10]

---

**8.** Virtually the only document habeas counsel contend was not known or accessible to Harris at the time of trial is a two-page compilation of handwritten notes by Stuart White, an officer of Skopbank, one of the Chase Group of Banks. White made these notes during a telephone conference call on January 24, 1992 between officers of the Banks and the Milbank Tweed law firm, counsel for Chase. White's notes describe certain negotiations with BPS, and then state: "have to have debt not just a claim, looks like no resistance." Habeas counsel profess to deduce from that rather cryptic statement the sinister suggestion "that Lynch's testimony was tailored to justify the transfer to Chase of $2.3 million of [Limited] funds from BPS' account in connection with the settlement of the interpleader action." SDB at 74.

I find no persuasive indication that White's notes, made almost a year before the AroChem Companies went under, had any relation to or influence upon Lynch's trial testimony at the subsequent criminal trial. The quoted statement is immediately preceded by: "Paribas replied w/a letter—Marathon [one of the interpleading plaintiffs] was told by Paribas that they would indemnify them against all liabilities, pay to Paribas' account." It is more plausible to suppose that the statement stressed by Harris's habeas counsel does no more than reflect the reality that "a basic jurisdictional requirement of a statutory interpleader action [under 28 U.S.C. § 1335] is

that there be 'adverse claimants' to a particular fund." *Libby, McNeill, and Libby v. City National Bank*, 592 F.2d 504, 507 (9th Cir.1978) (footnote omitted). The parties, desirous of invoking the procedural conveniences of the interpleader statute to settle their several disputes, would be concerned to ensure that the statute's jurisdictional prerequisites were satisfied.

**9.** "CLS" is a reference to Credit Lyonnais (Suisse), the second of the two Swiss Banks which handled Limited's accounts.

**10.** Habeas counsel for Harris have never disputed the assertion of AUSA Shapiro that, prior to trial, the government made available to trial counsel all documents the government received from the Chase Group of Banks, Union Trust Company, and the Swiss Banks, which the government had received either directly or through international treaty-invoked judicial assistance. *See* Shapiro Aff. at ¶ 12. On October 17, 1992, less than a month before trial, the government received BPS documents from Switzerland pursuant to a Treaty Request. As enclosures to a letter dated October 21, 1992, Shapiro sent defense counsel copies of the documents thus received that it contemplated offering into evidence. *Id.* at ¶ 13, Ex. G. Shapiro also says in his affirmation that in his October 21 letter, he "also invited Mr. Iason [lead trial counsel for Harris] to inspect the remainder of the docu-

In short, there is no basis to characterize as newly discovered evidence any of the documentary evidence habeas counsel urge in support of their contentions on this aspect of the case.

I turn now to Harris's contention that the Bank witnesses, Durney and Dinell, committed perjury when they testified at trial with respect to their knowledge of the nature and extent of Limited's activities, and that the government knew that testimony was perjured when these witnesses gave it.

Before examining these contentions in detail, it is useful to quote again from a recent Second Circuit case on point, *United States v. Torres,* 128 F.3d at 48–49:

> When a motion for a new trial rests on newly discovered evidence, the defendants must show: (1) that, with due diligence, they could not have discovered the evidence during trial, (2) that the evidence is material, and (3) that the evidence is non-cumulative.

> Where the newly discovered evidence is the existence of allegedly perjured testimony, the defendant must first demonstrate that perjury was in fact committed. And if the prosecution was unaware of the perjury, the defendant must also show that the jury probably would have acquitted in the absence of the false testimony. If instead the prosecution knew or should have known about the perjury, then the conviction will be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Thus, whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury (internal quotation marks and citations omitted).

In the light of these legal criteria, I will consider the trial testimony of the two Bank witnesses in turn.

### Suzanne Durney

■ At the pertinent times Durney was employed by Chase as a lending officer in the commodity finance division, and the account manager for the AroChem Companies. Trial Tr. 426, 428.

With respect to her knowledge of Limited's activities, Durney testified that in September 1990 she learned that Harris had set up Limited "to provide supplemental financing where the [Chase] banks' line of credit had been exhausted." Trial Tr. 508. Durney testified that Harris advised the Chase Group of Banks that AroChem had a contract to purchase a number of cargoes of Nigerian crude which were not destined for International's Puerto Rican refinery. Because the Banks "were not interested in financing the Nigerian contracts under the borrowing base facility," Harris "financed the purchase of the Nigerian crude via the AroChem International Limited bank lines," assuring the Banks that Limited "was not engaging in taking any positions for itself and it wasn't engaging in speculative trading, that it was set up to do merely take deliveries and finance deliveries under the Nigerian contract, and that it would from time to time provide financing to the AroChem groups on a case-by-case basis that would be disclosed to the banks." Trial Tr. 508–11. Durney was cross-examined at length on this subject.

While the earlier habeas briefs and affidavits for Harris made broad charges of perjury against Durney, the Court directed the service by Harris upon the government of Requests to Admit and the government to respond thereto. That exercise has served to sharpen the focus of Harris's contentions; and his most recent brief zeroes in on one aspect of Durney's trial testimony. It is said of Durney:

> Contrary to her testimony that she had no way of knowing what [Limited] was doing, in the civil litigation she admitted that she was provided with whatever information she asked for.

---

ments received pursuant to the Treaty Request." *Id.* One searches Shapiro's October 21 letter in vain for an explicit invitation, but it was apparent from the correspondence that the govern-

ment had received a number of documents in response to its Treaty Request, and there is no reason to suppose that the government would have resisted a defense request to examine them.

SDB at 55. That contention in the brief refers back to the first specification of perjury Harris included in his Requests to Admit, where it is said: "Durney testified falsely that she had no information about what [Limited] was doing." The reference for that testimony is Trial Tr. 570. The answer Harris now claims was perjurious Durney gave at the very end of the government's redirect examination; she was excused as a witness shortly thereafter. To place that answer in context, I will reproduce the preceding questions and answers from Trial Tr. 568–70, italicizing (after the fashion of a grand jury indictment for perjury) the testimony that Harris contends was knowingly false:

Q. Were you ever told that AroChem International Limited would be used to finance some of the trading activity of the other AroChem companies?

A. Again, I was told that it was just going to finance certain transactions that could not otherwise be financed by the AroChem group.

Q. And you've told us those transactions were, A, the Nigerian contract and, B, provided certain financing for cargoes headed for the refinery?

A. That's right.

Q. Were you told that AroChem International Limited might finance millions of dollars of trading in the WTI markets?

A. No, I wasn't told that.

Q. Were you told that AroChem International Limited might finance millions, tens of millions of dollars of trading in the Brent markets?

A. No, I was not.

Q. Would that have been—that information have been significant to you in making your credit determination?

A. Yes, it would have been.

Q. Would it, in fact, have affected the leverage ratios in the revolving credit agreement?

A. Yes, to the extent that the company had financed transactions that would add to—that AroChem's liabilities to AroChem International Limited, that they had substantial transactions with them, it would

have been reflected in the current liabilities to the company.

Q. Would you have been able to evaluate and monitor and determine how much trading the company was doing if—was some of it being financed through AroChem International Limited.?

A. *No, I didn't have information on what AroChem International Limited was doing.*

Harris quotes in his latest brief Durney's civil litigation testimony that habeas counsel say demonstrates the falsity of her trial testimony. At her deposition Durney testified that "[w]e requested that the company provide us, I think it was monthly, but a periodic update as to the activities of Limited"; that she did not recall asking AroChem "to establish Limited's account at Chase so that Chase could monitor Limited's activities"; that as to the requested reports, "we had a bit of difficulty getting it on a timely basis, but I do recall that some reports, that something was given to the banks. I don't recall what"; that the reports on Limited's activities followed the format of a May 19, 1991 letter from Dispenza to Durney (Ex. 14 to the Durney deposition); and that she was satisfied with the format of that letter, but did not recall taking "any action to investigate any of the activity" reflected in it. SDB at 55–56. Habeas counsel say in their brief without contradiction that the May 9, 1991 letter listed five transactions that Limited had done that month, "only two of which were under the NNPC contract." [11]

I cannot accept the contention of habeas counsel that Durney's civil deposition testimony brands her trial testimony as knowingly false. The fair-minded reader would not, as do habeas counsel, give a literal reading to Durney's statement at Trial Tr. 570 that she "didn't have information on what [Limited] was doing." Durney had previously testified at trial that she knew Harris had established Limited for the purpose of financing Nigerian contract cargoes and certain other cargoes bound for the AroChem refinery. That statement, taken in the context of the government's specific questions on re-direct that

---

**11.** That is a reference to the Nigerian crude oil contract referred to in text.

evoked it, indicates no more than that Durney lacked the particularized information about Limited that she had about the Aro-Chem Companies, the borrowers under the RCA. That is not surprising, since Chase regularly received the highly detailed BBRs from the Companies, as opposed to the intermittently furnished Limited "updates" Durney described at her deposition. Viewed in that light, which I think is fair, Durney's deposition testimony is more consistent than inconsistent with her trial testimony. The most that can be said for Harris, based upon the Limited "updates," is that Durney could have gleaned more information about that entity's activities than she did. But this falls well short of demonstrating, as Harris is required to do under *Torres,* that "perjury was in fact committed."

■ The latest habeas brief, at 57–59, seeks to buttress the charge of perjury against Durney by citing to the civil depositions of bank officers *other than Durney* and documents to which they referred, all in aid of arguing that *"the RCA lenders"* knew all about Limited's commercial activities. *Id.* at 59 (emphasis added). There are two problems with this approach.

First, the knowledge or perceptions of other bank officers (some from banks other than Chase) are not directly probative of Durney's knowledge or perceptions, and consequently the knowing falsity of her trial testimony.

Second, all the documents habeas counsel rely on in their effort to demonstrate the extent of Durney's knowledge about Limited were available to Harris at trial (including the Limited "updates" or reports Durney referred to in her civil deposition).

Thus Harris's petition for habeas relief based upon the alleged trial perjury of Durney fails to satisfy two of the initial requirements articulated by the Second Circuit in *Torres* and earlier cases: that Durney did in fact commit perjury at trial, or that such perjury, if committed, could not have been exposed at trial by the use of evidence discoverable by due diligence.

*Alexander ("Sasha") Dinell*

■ At the pertinent times Dinell was the manager of the commodities division at the New York branch of Bank Brussels Lambert ("BBL"). In that capacity he was involved in the account maintained at BBL by the AroChem Companies. Trial Tr. 2501–03. BBL was one of the Chase Group of Banks participating in the RCA.

According to Harris, Dinell gave perjured testimony in response to a question put to him by the government during his direct examination. Dinell was describing a lunch meeting at the Rainbow Room in November 1991 between Harris, Dispenza, and a number of representatives of the Chase Group of Banks. One of the subjects for discussion was a supplemental $100 million financing that the Banks reluctantly extended to Aro-Chem in October in response to Harris's protestations of need. Harris had given assurances at that time that no comparable request would be made in November, but now he was making one, and the Banks were not happy about it. Dinell testified (the allegedly perjurious answer is indicated in italics):

A. The banks had said in October that they absolutely would not extend any more lines at all; and that in fact he had better live up to his commitment to make sure there would be no such financing requirement in November.

And now there appeared to be such a requirement. So one of the reasons for this lunch was to find out what in the world he intended to do about it because we for sure as BBL were not going to extend any more credit.

Q. So what happened at this meeting?

A. Well, we talked about it and talked about it. He indicated that if he couldn't get any of the working capital banks to finance this book, that perhaps this could be done through AIL. That is that separate company, and that he could not get another bank to finance it as a separate transaction. And we said that that would be fine from our point of view.

And he said, or actually maybe Mr. Dispenza at this point said they weren't sure if they could arrange that. So our question was if you cannot arrange that, then what? And Mr. Harris said, well, I guess

we'll just have to declare bankruptcy, ha-ha-ha. It was obviously meant as a joke, and we all laughed, and that was it.

Q. Did Mr. Harris laugh?

A. Oh, yes.

Q. Who was present from the company at that meeting? Just Mr. Harris and Dispenza?

A. From the company, just those two.

Q. Who did the talking at that meeting?

A. Mr. Harris.

Q. What did Mr. Dispenza do?

A. Well, a little bit of talking, but mostly eating.

Q. Was it unusual for Mr. Harris to do most of the talking at a meeting at which they were both present?

A. Not, it was not unusual. Mr. Harris generally would lead a meeting where both were present.

Q. What happened after this meeting? What happened with that next WTI book that had to be financed?

A. It was in fact financed. The contracts were sold to AIL, the bank members all signed off on a subordination agreement which would grant the bank financing AIL to—you know, the security interest it needed in that inventory. And it was done by AIL.

Q. So the banks executed a formal agreement granting permission to AIL to finance this portion, this WTI book elsewhere, through other banks?

A. Essentially, yes.

Q. Had the banks ever executed such an agreement before that?

A. I believe that there will be a couple of cargoes at the—in the year prior, about a year earlier, that we were aware of were being done through AIL.

Q. And aside from those separate cargoes, were any of the monthly crude books, had the banks granted permission or subordinated their interest to the banks that were financing AIL?

A. No.

Q. Were the banks, or at least your bank, was Banque Brussels Lambert aware prior to this November WTI book that AroChem International Limited through separate banks was financing some of the earlier crude books?

A. *To my knowledge the bank was not aware of that.*

Trial Tr. 2527–29.[12]

The SDB at 43 misquotes the question that elicited Dinell's supposedly perjurious answer, by omitting from that question the phrase "through separate banks," a phrase that precedes the words "was financing."

In contrast to Durney, habeas counsel for Harris do not point to any civil deposition given by Dinell as a basis for characterizing his trial testimony as perjury. Rather, in the discussion at SDB 45–55, Harris relies primarily upon documents to support his present argument that, if carefully read by representatives of the Chase Group of Banks (including Dinell at BBL), the Banks would have "had direct notice from AroChem of the use of the RCA proceeds and that the RCA lenders' losses were caused neither by Aro-Chem's bookout of contracts to [Limited] nor by the opportunistic trading which those bookouts allegedly freed up AroChem to do." SDB at 50.[13] It follows, the argument with respect to Dinell concludes, that because "Dinell knew of the Brent and WTI transactions," *id.*, he perjured himself when he denied knowledge prior to November 1991 that Limited "through separate banks was financing some of the earlier crude books."

I do not find it necessary to plumb the merits of Harris's present theory to their depths because almost all the documents upon which that theory relies were either trial exhibits or readily accessible to Harris at that time. These include the various bank statements generated by Chase, Union Trust Company, and the Swiss Banks, SDB at 45–46; the BBRs, discussed in the SDB at 46–49, and referred to in support of Harris's

---

12. For some reason not apparent, at this stage of the transcript the pagination on the Court's copy differs from that those available to counsel. The reference in text is to the Court's copy.

13. "Bookouts" are references to oil trading on markets known to the trade as "Brent" and "WTI" (short for West Texas Intermediate).

argument that the Banks provided "supplemental" financing to AroChem totaling $1.5 billion outside the RCA facility, a fact which Harris now contends "is evident on the face of the borrowing base reports given to the RCA lenders," *id.* at 46, so that "at a glance, any RCA lender could determine how much of the RCA loan proceeds were being utilized at any given time for the purchase of oil through letters of credit," *Id.* at 49; and the "daily activity reports provided by AroChem to the RCA lenders," which Harris says "gave them the same information in a different format," SDB at 49. Harris's argument, in summary, is that these documents show that the Chase Group of Banks knew all there was to know about the Companies' and Limited's trading and financing practices, and since Dinell was employed by one of those Banks he knew everything too, so he lied when he said he didn't. But none of these documents can possibly be characterized as newly discovered evidence.

The same is true of all but one of the additional documents discussed in the SDB at 51–55 in an effort to make the specific showing that Dinell committed perjury. The only exception is what habeas counsel describe as "a newly discovered document dated February 5, 1992, evidencing a post-default investigation by BBL into the AroChem fiasco," *id.* at 53, *see* 2 Conway Ex. 65, in which unidentified BBL representatives respond to questions posed by unidentified interrogators. Asked if they were aware of Limited's existence, the respondents said:

> Yes. We were told that its sole purpose would be to do transnational oil trading deals, to be financed by other banks, without any connection with the financing of the refining and distribution operations in Puerto Rico.

This declaration is consistent with Dinell's trial testimony describing what Harris told the Banks about Limited:

Q. What if anything were you told about what the activities of AroChem International Ltd. would be?

A. The information we were given was that its AroChem companies had certain inventory which rather than going to the refinery would be sold to a third party, and that this was a normal practice in order to optimize the particular crude oil or condensate, or whatever feedstock it is that went into the refinery itself. So certain purchases would simply get sold into the open market to a third party.

Those transactions could be taken out of the AroChem Corporation balance sheet, in essence, and sold to this new AIL, whose sole purpose, as we understood it, would be to finance these specific transactions that we would know about.

Trial Tr. 2514.

The most that habeas counsel can make of this newly discovered document is to argue that "[t]here is nothing in this statement which indicates that [Limited] would not engage in contracts for the purchase and sale of Brent or WTI which were products commonly subject to 'transnational oil trading deals.' " SDB at 54. This falls well short of demonstrating that in his denial of full knowledge of Limited's trading activities, Dinell was a perjurer, defined by the statute as one who in testimony before a court "knowingly makes any false material declaration," 18 U.S.C. § 1623(a). Harris's references to civil litigation depositions by Dispenza and Classon, hardly disinterested witnesses, fare no better in that regard.[14]

As with the case of Suzanne Durney, Harris has failed to show that Alexander Dinell did in fact commit perjury at trial, and that such perjury could not have been exposed at trial by the use of evidence known to the defense or discoverable by due diligence. Accordingly Dinell's testimony furnishes no basis for habeas relief.

---

14. I have discussed in text the particular answers made by Dinell upon which Harris bases his charge of perjury in the SDB. Harris's Requests to Admit, at Nos. 23–30, while referring to other portions of Dinell's testimony, do not assist his present argument. To the extent that these Re-

quests involve Dinell's testimony about the net open position covenant in the RCA, that subject has been dealt with in Part V(A), *supra.* As to the remaining Request to Admit, No. 23, Harris has not shown that Dinell's quoted answer was perjurious.

### PART VIII: *The Testimony of Dispenza and Seniff*

 Dispenza and Seniff, former Aro-Chem officers responsible for the Companies' financial affairs, entered into cooperation agreements with the government. They testified at trial that Harris was both the architect of the fraud perpetrated upon the Chase Group of Banks and its principal perpetrator, by means of his fraudulent misrepresentations and omissions during the series of meetings with Bank representatives that were convened throughout the lifetime of the RCA. Dispenza was the most important government witness on these points, but Seniff furnished significant corroboration.

Habeas counsel contend that this trial testimony constituted knowing perjury. In contrast to witnesses from the Banks, trial counsel for Harris adopted the same stance with respect to Dispenza and Seniff. Trial counsel argued to the jury that, in the circumstances revealed by direct and cross-examination, Dispenza's and Seniff's testimony inculpating Harris was not credible. Whether or not counsel used the word "perjury" in his attack upon the testimony of these witnesses, that was clearly the thrust of Harris's trial defense. That defense did not succeed.

 ▪ In light of the authorities discussed *supra,* habeas counsel cannot in this proceeding revisit the truth or falsity of Dispenza's and Seniff's testimony on the basis of evidence known to Harris or his defense counsel at the time of trial or discoverable by them at that time by the exercise of due diligence.

Rather, habeas counsel must, as an initial proposition, demonstrate that evidence developed subsequent to the criminal trial, and undiscoverable at that time, reveals the trial testimony of Dispenza and Seniff to have been perjurious. Habeas counsel attempt to do that primarily by referring to Dispenza's testimony in depositions generated by the AroChem civil litigation. Not surprisingly, Dispenza has been much in demand as a witness in that welter of law suits. Indeed, Dispenza continues to testify, in one or another of them, to this day; despite the fact that briefing was closed by Court order and this proceeding has been *sub judice,* I continue to receive letters from habeas counsel about what Dispenza has said most recently.

Quite clearly, Dispenza would rather be somewhere else than in a round of depositions, surrounded by an unfriendly swarm of lawyers representing banks, auditors, and other entities that wish they had never heard of AroChem. Dispenza's deposition testimony is frequently defensive, and his recounting of events, in the face of hostile interrogators thrusting documents at him, may not always be persuasive. It may even be argued—indeed, habeas counsel argue—that discrepancies exist between certain aspects of Dispenza's seemingly endless deposition testimony and his trial testimony.

But that is not so with respect to the principal points of Dispenza's trial testimony, which were (1) that during an April 1990 meeting of AroChem officers, the Companies having suffered trading losses and facing a regularly scheduled independent audit, Harris told the AroChem officers that the Companies should pass the audit by whatever fraudulent means were necessary; and (2) that thereafter Harris, by fraudulent misrepresentations and omissions, deceived the Chase Group of Banks. Dispenza's deposition testimony does not give the lie to those aspects of his trial testimony. For example, during a deposition quoted in Harris's main brief at 38–40, focusing upon whether Harris had instructed Dispenza to falsify BBRs *prior* to the August 1990 meeting, Dispenza testified: "*Ultimately we get the instructions from Harris to defraud the auditors for the purposes of getting through the audit.* Prior to that period in time, it was knowledge [sic] by Mr. Sebastian, Mr. Sheperd, Mr. Harris and myself that the company had incurred substantial losses . . ." (emphasis added).

I need not extend this discussion because, even if Dispenza's civil deposition testimony may be read to demonstrate perjured trial testimony, and even if the government was aware of that perjury, Harris must also show the existence of "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Harris,* 79 F.3d at 233 (citation and quotation marks omitted); *Torres,* 128 F.3d at 49.

The Second Circuit's decision rejecting Harris's direct appeal affirmed, *inter alia,* this Court's denial of a prior Rule 33 motion, filed by successor counsel other than habeas counsel. The "newly discovered evidence" upon which that earlier Rule 33 motion was based consisted of "a computer file in the AroChem computer system" which, Harris's then counsel argued, demonstrated that Dispenza had perjured himself in testifying that three sham oil contacts had been sent to him by Harris, an issue of sufficient importance to require a new trial. *See* this Court's post-trial opinion, 1993 WL 300052 at *14. I denied that Rule 33 motion on the ground, *inter alia,* that while Harris insisted "that the jury verdict was dependent on Dispenza's testimony, the record reveals 'ample independent evidence of guilt.'" *Id.* at *21 (quoting *United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir.1981)). I then said:

> The government called twenty other witnesses in this case. Their testimony, coupled with the documentary evidence offered during their testimony, was more than enough to convict the defendant on every count in the indictment. The bankers testified to the negotiations and terms of the lending agreement; to the defendant's statements made in person and on the telephone about AroChem's "compliance" with the agreement; and to Harris's representations concerning the financial condition of AroChem. Dean Seniff, an AroChem employee, testified that he told Harris about AroChem's operating deficit, and that Seniff, Harris, and Dispenza discussed how to deceive the banks and the auditors. Other witnesses described the working environment at AroChem as an intimate place where even the secretaries knew AroChem was performing poorly and assuming enormous trading risks; and described defendant's command of the company's day-to-day trading activities and financial condition. The documentary evidence provided details regarding specific fraudulent activity.

*Id.* That led me to conclude "that the jury could with little difficulty have disbelieved Dispenza and nonetheless convicted Harris on the basis of evidence from other sources. His Rule 33 motion is therefore denied." *Id.*

When the case reached the Court of Appeals, it said on that point:

> Harris also argues that the district erred in denying his motion for a new trial, pursuant to Fed.R.Crim.P. 33, because new evidence that he discovered during trial conclusively demonstrated that Dispenza committed perjury when he testified at trial and that the government should have been aware of this. Even if we assume that Dispenza committed perjury and that the government was aware of it, Harris failed to make the requisite showing that "there [was] any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991) (citation and quotation marks omitted), *cert. denied,* 508 U.S. 939, 113 S.Ct., 2414, 124 L.Ed.2d 637 (1993). Accordingly, we reject Harris' argument that the is entitled to a new trial.

79 F.3d at 233.

 In the context of the present habeas petition and Rule 33 motion, the government contends that these District Court and Court of Appeals rulings constitute the law of the case, thereby foreclosing Harris's renewed Rule 33 motion. Harris responds that while both courts used broad language, the earlier Rule 33 motion involved only a single, discrete evidentiary item (the computer file), to which those rulings should be confined, and that the law of the case doctrine does not apply to different and broader evidentiary issues arising out of the civil litigation.

I think that habeas counsel for Harris have the better side of that dispute, but it avails Harris nothing, because there remains his failure to demonstrate a reasonable likelihood that Dispenza's testimony, assumed for the purpose of this analysis to be false and known by the government to be false, could have affected the judgment of the jury, as the Second Circuit cases require.

The main thrust of the government's case was that AroChem defrauded the Chase Group of Banks, and that Harris supervised the implementation of that fraud, for the purposes of engaging in speculative trading and enriching himself. The principal sources

of the government's evidence were: (1) Bank witnesses, who testified about the RCA, the safeguards it contained from the Banks' point of view, and the assurances and reassurances that Harris gave the Banks with respect to AroChem's compliance with those safeguards; (2) documents generated primarily by the AroChem Companies, Limited, and their banks, which the government argued to the jury showed what AroChem was really up to; (3) the expert accounting opinions of Lynch, bearing upon the same subject; and (4) the testimony of Dispenza and Seniff.

If one focuses upon the structure of the AroChem Companies, including Limited, the Bank witnesses may be described as "outside" witnesses, that is to say, individuals who lived, moved, and had their being outside the Companies; and Dispenza and Seniff as "inside" witnesses. Of course, it was useful for the government to have available inside witnesses like Dispenza and Seniff, in a position to describe the genesis of the fraudulent scheme and those aspects of its design and implementation that took place within AroChem's walls, beyond the sight or hearing of the scheme's intended victims. But the Bank witnesses were able to, and did, describe the many meetings Bank representatives had with Harris and Dispenza, at various locations, where Harris gave his Companies' original undertakings, and thereafter soothed the Banks' growing concerns with reassuring accounts of the Companies' financial condition, what AroChem was and was not doing, what Harris intended to do and what he would refrain from doing: why, in short, the Banks had nothing to worry about. And it was Harris, the Bank witnesses also testified, who played the dominant role at those therapeutic sessions which Dispenza also attended: "Mr. Harris generally would lead a meeting where both were present." Trial Tr. 2528 (testimony of Sasha Dinell).

The jury was entitled to believe all this testimony of the Bank witnesses, and, moreover, to consider that testimony in combination with the government's documentary evidence, as explicated (in part) by Lynch. I think it is clear that, even if Dispenza's testimony be disregarded entirely, there was sufficient evidence from these other sources to sustain the jury's verdict. That is true *a fortiori* of the testimony of Seniff, a much less prominent witness.

PART IX. *The Diversion of AroChem Funds to Harris*

In order to convict Harris for conducting a continuing financial crimes enterprise in violation of 18 U.S.C. § 225, the government had to prove at trial that Harris "received $5,000,000 or more in gross receipts from such enterprise during any 24–month period." *Id.* at § 225(a)(2).

The government undertook to meet that burden by eliciting proof that Harris received a total of $7,333,758 from AroChem-related activities during the period from April 1990 through December 1991. It prepared trial exhibits, GX 1031 and 1032, that summarized Harris's receipts from five sources. Of those sources, the sum of $4,875,089 was designated as "payments from Limited to Harris," and $843,620 as "payments from Limited to Starwood Corp." Thus the payments from Limited make up $5,718,709 of the total payments of $7,333,-758.

While habeas counsel are mathematically correct in arguing that the inclusion of these payments from Limited was essential to Harris's conviction under § 225, that computation furnishes no basis for habeas relief.

I have already dealt with the contention of habeas counsel that Limited's payments of $4,875,089 to Harris should not be counted because at those times Limited was not indebted to the AroChem Companies, and the payments represented commercial profits to which Harris was entitled. That habeas claim fails because it is based upon documents that existed at the time of trial, were known to defendant, and accessible by him, and accordingly do not constitute newly discovered evidence. *See* Part VII at 25–32, *supra.* The reality of that circumstance is only highlighted by the statement in Harris's Main Brief at 112 that

[t]he government failed to disclose to Harris's counsel and to this Court that it had in its possession all kinds of accounting

records for AIL which documented every AIL transfer and the reason for such transfer. These records included the general ledger. Moreover, the government knew that these records had been created and maintained by numerous AroChem employees, such as Greg Holtzhauer and Christine Broderick, in the ordinary course of their employment.

When one considers that all of these contemporaneous documents were generated by the AroChem Companies, of which Harris was CEO, or the Companies' banks, and that there is no reason to doubt that the government made them available for pre-trial examination by Harris and his attorneys, *see* Part X, *infra*, it is difficult to imagine material less deserving of the designation "newly discovered evidence."

In his SDB, Harris singles out the $843,620 paid by Limited to "Starwood Corp." for separate discussion. The government's theory, which it argued first to the Court and then to the jury, was that Starwood Corp. was an entity owned and controlled by Harris, so that Limited's payments to Starwood Corp. should be viewed as payments to Harris. The government relied upon Dispenza's testimony that, at Harris's direction, Dispenza set up the financing for two entities, Starwood Corp. and Starwood Holdings; and that Harris was "the owner of Starwood Holdings" and "the majority owner of Starwood Corp., together with one Manuel Rojas, a business acquaintance of Harris's." Trial Tr. 1567–68.

Habeas counsel for Harris now point to an FBI "302" form memorializing an interview FBI Agent Edward Stroz conducted of Rojas on March 3, 1992, in which Rojas identified himself as a Puerto Rican resident and the president of Starwood Corporation, whose business was selling lumber products milled in Indonesia to customers in Puerto Rico. The "302" recites that Rojas told Stroz that Starwood Corporation was a Delaware corporation, in existence since October or November 1990. When Starwood Corporation was formed, Dispenza was its treasurer. Rojas further told Stroz that Starwood Corporation was owned by Petromet, Inc. of New York, which was in turn owned by Island Re-

sources of the British Virgin Islands, which was in turn owned by Citco Trust, British West Indies, whose parent was an unidentified "large Netherlands-based company."

Rojas made no mention of Harris as the holder of a beneficial interest in Starwood Corporation. He did tell Stroz that Starwood Corporation bought its lumber from "Starwood Holdings Limited," of Nassau, Bahamas, which "was formed in October or November of 1990 and is believed to be owned by and/or run by Will Harris," and was "operated with a line of credit from Paribas, though this may have ended."

Habeas counsel also point to two forms furnished by Credit Lyonnaise (Suisse) to the government pursuant to the latter's Request for Judicial Assistance. These forms are captioned "Declaration on opening an account or securities account." Both forms are dated September 6, 1991. One form is signed "Starwood Corporation" (typed) "by Manuel Rojas, President" (handwritten). The other form is signed "Starwood Holdings Ltd." (typed) "by William R. Harris, President" (handwritten). Each form contains recitations that "the undersigned hereby declares (mark with a cross where applicable)" as "holder of the account" that "he is the beneficial owner of the assets to be deposited with the bank." Those boxes have been marked with crosses.

While there was clearly a relationship of some sort between Starwood Corporation and Starwood Holdings, and there was clearly a relationship of some sort between Rojas and Harris, I agree with habeas counsel that these documents are arguably inconsistent with Dispenza's trial testimony that Harris was the "majority owner" of Starwood Corporation. However, since no one had better knowledge than Harris of whether or not he held a beneficial interest in Starwood Corporation, and there was evidence available to him to show that he did not (if that be the fact), Harris has no claim for habeas relief under *Brady, Giglio,* or otherwise. *See United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995), discussed at greater length under Part X, *infra*.

PART X: *Brady Claims With Respect to Documents*

Harris contends further that the government violated its duties under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). He states that the government "utterly and repeatedly disregarded its obligations" under these cases, "by withholding clearly material exculpatory evidence." Main Brief at 244. Harris's submissions are laced with references to voluminous documents which he alleges the government either "failed to designate as *Brady* material" or "did not turn over as *Brady* material."

Examples of this allegedly concealed documentary evidence include a letter from Coudert Brothers to the RCA lenders; a credit memo signed by Sasha Dinell; an August 27, 1991 Swiss Bank memo; Dispenza's personal trading records; wire transfer forms from Dispenza's personal accounts; Dispenza's handwritten notebook; the general ledger and other financial documents from AIL; various financial records obtained by the government from the Swiss banks; the audited financial statements of AroChem; FBI 302s from interviews of Maria Agovino, Stuart White and David Ottley; various internal bank memoranda, including those from Stuart White, Sasha Dinell, Gregory Classon, Cheryl LaBelle and Gus Forgione; the handwritten notes of Kikka Harrison; the January 22, 1990 borrowing base report; the September 7, 1990 Ernst & Young report of independent auditors, and various other documents from J. Aron, the RCA banks, and the AroChem companies themselves.

To establish a *Brady* violation, Harris must demonstrate "(1) that the government failed to disclose favorable evidence, and (2) that the evidence it 'suppressed' was material." *United States v. Payne,* 63 F.3d 1200, 1208 (2d Cir.1995). But Harris has failed to establish that the government concealed, suppressed, or in any way withheld any of these documents before his trial. In fact, the probative evidence shows that all the documents within the government's possession were made available to Harris's trial counsel. That is significant, since the government's

duty to disclose under *Brady* is perforce limited to "favorable evidence known to it." *Id.*

AUSA Shapiro, the lead prosecutor at Harris's trial and the investigation proceeding it, avers that, due to the large volume of evidence in Harris's case, he "determined that it was appropriate for the Government to make essentially 'open-file' discovery to Harris." Shapiro Aff. ¶ 3. He states that he invited Harris's counsel "to review virtually all of the evidence that the Government obtained, whether by subpoena or otherwise, from third parties." *Id.* Shapiro mailed the BBRs, the RCA, and all documents alleged to have been forged or altered directly to Harris's counsel by cover of a letter dated June 4, 1992. *See id.* at ¶ 4. He explained to Harris that the other documents were available for inspection, either in Shapiro's possession or in Bridgeport, Connecticut, where documents were held in connection with a criminal tax investigation. *See id.* at ¶ 5.

Shapiro asserts that all documents obtained from the Chase banks, the Swiss banks, and the AroChem companies were made available. *See id.* at ¶ 12. He states that he is "aware of no document that the Government received from any of the Chase group of banks, any of the Swiss banks, Union Trust Company, AroChem Corporation, AroChem International Inc., AroChem International Limited, or any of AroChem's trading partners, including J. Aron, that was not made available for the inspection of Harris's defense team." *Id.* at ¶ 18.

Gary Smith is the paralegal in the United States Attorney's Office who assisted Shapiro and AUSA Julie R. O'Sullivan in preparing for Harris's trial. He described in his affidavit how the government assembled all the documents received from third parties in a room referred to as the "AroChem Work Room." Smith Aff. ¶ 2. Smith understood that all documents from third parties should be placed in that room. *See id.* The documents within that room were listed on the "AroChem Index," dated October 6, 1992. *See id.* at ¶ 6. According to Smith, Harris's defense team reviewed those documents file by file. *See id.* at ¶ 7.

Robert Buehler, an attorney on Harris's trial team, corroborates Smith's description of the AroChem Work Room. *See* Buehler Response 2(b). Buehler was "permitted to review any documents inside the room." *Id.* at 2(d). Although he could not remember the specific documents identified by Harris's habeas counsel, Buehler remembers reviewing "hundreds, if not thousands, of documents." *Id.* at 2(i).[15]

In response to these affidavits, Harris argues that "Shapiro's affirmation does not establish that the Brady material was not removed from the roomful of documents." Reply Br. at 79. However, the government does not bear the burden of establishing that documents were *not* withheld; it is Harris's burden to prove that the government failed to disclose evidence favorable to Harris. *See Payne*, 63 F.3d at 1208. Conclusory allegations that the government "suppressed" or "concealed" evidence do not entitle Harris to relief; nor do they suffice to entitle Harris to an evidentiary hearing on whether documents were withheld. *See United States v. Avellino*, 136 F.3d 249, 261 (2d Cir.1998) ("In the absence of a proffer by Avellino of any nonspeculative basis for inferring that ... the government had not made available to him all pertinent material in its possession, it was well within the discretion of the court to conclude that no evidentiary hearing was necessary.").

In addition, Harris cannot argue that any of this documentary evidence was suppressed within the *Brady* context if he " 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.' " *Payne*, 63 F.3d at 1208 (internal citations omitted). The documentary evidence that Harris claims was suppressed was made available to him well before his trial date. Indeed, some of these documents were produced by Harris's own companies or their officers. If Harris or trial counsel had entertained any inclination to pursue the arguments at his trial that his habeas counsel are now advancing, all the evidence was available to him in the open-file discovery made by the government. The record reveals no attempt by the government to conceal any documentary evidence from Harris.

■ Having provided no evidence that any documents were concealed by the government before trial, Harris must rely on the lesser claim that the government violated its *Brady* obligations by failing to designate specific documents within its files as exculpatory of Harris and identify them to Harris's trial counsel. This argument must be rejected. As stated at Part IV of this opinion, Harris's present contentions and theories of the case are vastly different from Harris's trial strategy. To require the government to designate all of these documents as *Brady* material would be to require the government to formulate and identify all possible evidentiary support for a defense theory that *the defendant never adopted before or during his trial.* Quite apart from casting the government in the impossible role of soothsayer, this far exceeds the scope of the government's obligations under any court-articulated application of *Brady.*

Not all of the documents Harris alleges were "suppressed" relate to Harris's new theory on the present motion. Some of them, including Dispenza's notebook and trading records, and wire records relating to Dispenza's accounts, are advanced by Harris as further evidence of Dispenza's central role in the scheme at AroChem.[16] First, as stated above, there is no evidence that these documents were concealed from Harris. Second, even if they had been suppressed,

---

**15.** There were additional sources of documents before Harris's trial. Richard Tufaro, attorney for Chase Manhattan bank, states that Chase and the other lending banks, "at their expense, arranged for all of AroChem's records, including its records in Puerto Rico, ·to be stored with Jefferson Archives in New Haven, Connecticut." Tufaro Aff. ¶ 8. Harris does not claim that he was denied access to these AroChem records.

**16.** This category of documents includes the forms recording wire transfers from AIL accounts to Dispenza's personal accounts, transfers that Dispenza testified were loans from Harris. Dispenza had altered the date on one of these forms, allegedly with Harris's consent, in order to effect a second transfer from AIL accounts. If, in fact, Harris had never authorized these transfers as loans to Dispenza, he was in the best position to produce evidence to refute Dispenza's trial testimony. *See infra* at Part XI.

evidence is not "material" in the constitutional sense when it "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Payne*, 63 F.3d at 1210. Accordingly, these documents provide no basis for relief. Dispenza was subject to extensive cross-examination and impeachment at trial, and casting further doubt on his credibility cannot avail Harris.

### PART XI: *Brady Claims With Respect to Witnesses*

 Harris also claims that the government violated its *Brady* obligations by failing to notify him of witnesses who could provide exculpatory information. These witnesses were alleged accomplices in the AroChem scheme, including Gene Sebastian, Joseph Sheperd, Gregory Holtzhauer, Robert Hamblin, Maria Agovino and Manuel Rojas.

 Harris alleges that many of these alleged co-conspirators could have provided exculpatory evidence at his trial. But Harris did not call any of these witnesses to testify at his trial. He cannot argue that the government concealed their identity from him; they were all his business associates or employees at AroChem. Just as with documentary evidence, a defendant cannot argue that an exculpatory witness was concealed under *Brady* if he knew or should have known of the essential facts regarding that witness. *See Payne*, 63 F.3d at 1208. Accordingly, if Harris knew or should have known the substance of a witness's potential testimony, the failure of the government to inform him of that evidence not a *Brady* violation.

This doctrine, that evidence is not suppressed under *Brady* if it was available to the defendant before trial, takes on a particular significance with regard to alleged co-conspirators. If a defendant denies the existence of the conspiracy alleged by the government, or his participation in it, the alleged co-conspirators would obviously be desirable defense witnesses (assuming, of course, that the defendant's denial is the truth). The Second Circuit has consistently held that the government does not violate its *Brady* obligations by failing to inform a defendant regarding the testimony of an alleged co-conspirator or other participant.

This is because the facts underlying exculpatory testimony by a participant concerning defendant's actions (if that testimony is truthful) should be known by the defendant. *See, e.g., United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir.1990) (because defendant already knew facts of witness's exculpatory testimony, government had not suppressed the information under *Brady*); *United States v. Ruggiero*, 472 F.2d 599, 604 (2d Cir.1973) ("[Defendant] had every reasons to believe, if his own denial of his or their involvement in [the crime] is accepted, that [the alleged accomplices] would in all likelihood corroborate his testimony.").

As the Second Circuit stated in *Ruggiero*,

> The purpose of the *Brady* rule is not to provide a defendant with a complete disclosure of all evidence in the government's file which might conceivably assist him in preparation of his defense, but to assure that he will not be denied access to exculpatory evidence known to the government but unknown to him. Here the appellant was on notice of the essential facts required to enable him to take advantage of such exculpatory testimony as [the alleged accomplices] might furnish. He was also well aware of the process by which they could be compelled to testify at trial.... If appellant wanted their testimony, the obvious and logical course was to subpoena them and put them on the witness stand.

*Id.* at 604–05. The same can be said for Harris. If, as Harris claims, he was not criminally associated with Sebastian, Sheperd, Holtzhauer and others, who could better corroborate his claim than those men themselves? And who would be in a better position than Harris to know they could give such testimony? While Harris complains that some of these witnesses refused to speak with him before his trial, he never attempted to subpoena any of them.

Moreover, AUSA Shapiro provided a list of co-conspirators as part of a bill of particulars provided to the defense team. *See* Shapiro Aff. Ex. H. This list included every witness Harris now claims was concealed from the defense. While Harris now argues that this list of thirty-three names was too long to be

truly helpful or meaningful, Harris could be expected to best know which of his employees and associates could provide the most exculpatory information, were he truly innocent. In addition, Shapiro wrote to trial counsel for Harris, specifically informing them that "both Sebastian and Holtzhauer have essentially denied being knowing, intentional participants in the fraud charged in this case." *Id.* at Ex. K. And although Harris now argues that "Rojas's testimony would have been devastating" to the government's case, Reply Br. at 107, Harris admits that the government notified him before trial that Rojas might "possess arguably exculpatory testimony." Shapiro Aff. Ex. I.

In the face of these disclosures by the government, and given the relationship of Harris to the witnesses he claims were concealed from him, Harris's *Brady* claims with respect to these witnesses must be rejected.[17]

### PART XII: *Intimidation of Defense Witnesses*

Harris also maintains that the government denied him a fair trial by harassing and intimidating several potential witnesses for his defense: Gene Sebastian, Kelly Dunn, Robert Hamblin and Karyn Lessa. Harris claims that the government acted in bad faith by preventing these witnesses from testifying at his trial, and supports this claim with testimony elicited during depositions taken in the course of the civil litigation. Harris argues that this behavior by the government amounted to a denial of due process.

■ The Second Circuit, in *United States v. Pinto*, 850 F.2d 927 (2d Cir.1988), stated that

Under certain circumstances, intimidation or threats that dissuade a potential witness from testifying may infringe a defendant's due process rights.... The circumstances will warrant reversal only if the government's conduct interfered substantially with a witness's 'free and unhampered choice' to testify. That interference may involve threats of prosecution, or other intimidating conduct that was *designed* to intimidate. A court also will look to factors beyond the government's control to determine whether a witness's decision not to testify resulted from the government's conduct.

*Id.* at 932 (quoting *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir.1980)) (citations omitted) (emphasis in original). Under *Pinto*, then, a court must find substantial government interference with a witness's decision to testify in order to grant relief.

■ In *Buie v. Sullivan*, 923 F.2d 10 (2d Cir.1990), a habeas corpus petitioner argued that the government had violated his right to present a defense by arresting a potentially exculpatory witness and charging him as an accomplice; the witness then invoked his fifth amendment privilege and refused to testify for the petitioner. *See id.* at 11. The Second Circuit articulated a three-part test to determine whether the government had violated the defendant's rights: first, a defendant must show that the evidence not presented was "material and exculpatory," and of such a nature that similar evidence was unavailable; second, the defendant must prove bad faith on the part of the government; third, the alleged misconduct must have been of such a quality as to necessarily prevent a fair trial. *Id.* at 11–12.

Harris's claims regarding intimidation of witnesses, set out below, must be evaluated in light of *Pinto* and *Buie*. I will discuss each witness in turn.

*Gene Sebastian*

■ Sebastian was the Executive Vice–President at AroChem. Sebastian testified in a civil deposition that he believed the government was trying to intimidate him. *See* Harris Ex. 43 at 200. He stated that "[FBI Agent] Ed Stroz called my home one time and I wasn't home and my wife an-

---

**17.** I should add in this context that as part of my oversight of the discovery conducted during the present motion, I reviewed all of the testimony given before the grand jury investigating the Aro-Chem scheme, including the testimony given by Sebastian, Sheperd and Holtzhauer. Aside from denials of their own wrongdoing, I found no testimony that was exculpatory of Harris. The same can be said for the notes of the Assistant United States Attorneys, which I reviewed before denying Harris's request for access to those documents. *See* my Opinions in this case of February 5, 1998, and March 6, 1998 (filed under seal).

swered, and he grilled her to the point when I got home, she was crying like crazy." *Id.* at 201. While he was not sure exactly what Stroz had said to his wife, he believed that he "said a lot of things that scared her ... about what was going to happen to me." *Id.* at 202. Sebastian testified that he also felt intimidated by the "normal FBI attitude," which he described as "doing business in a very matter of fact way." *Id.* at 201.

The government also offered Sebastian a plea agreement, whereby he would plead guilty to bank fraud and perjury before the grand jury; Sebastian rejected this deal because the counts "were not true." *Id.* at 204. AUSA Shapiro also requested that Sebastian submit to a lie detector test with the FBI. Sebastian's lawyer was asked to leave the room during the test, and after the test, an FBI agent told Sebastian that he had failed and asked him to confess. *See id.* at 207–08. Sebastian testified that his lawyer then "broke into the room," and they left immediately. *See id.* at 208. Harris's trial attorney attempted to speak to Sebastian before the trial, but never was able to do so. *See* Harris Ex. 28 at 148. Sebastian did not testify at trial. Sebastian was not allowed to attend Harris's trial, because the government informed him that he might be called as a witness for the government.

Leaving aside the question of whether Sebastian's testimony could possibly have been either material or exculpatory, Harris fails to allege governmental behavior that amounts to a denial of rights under *Buie* or *Pinto*. Counsel for Harris never attempted to subpoena Sebastian to testify; counsel for Harris did not call any witnesses at all. Moreover, while the behavior of prosecutors and FBI agents during the AroChem investigation may have been unpleasant for Sebastian and his wife, it did not rise to the level of bad faith required to find a constitutional violation. There is no evidence that Sebastian ever desired or intended to testify on Harris's behalf. There is no evidence that his unwillingness to speak to Harris's counsel was caused by government pressure rather than a desire not to incriminate himself.

*Kelly Dunn*

 Dunn was a trader at AroChem with Harris. She testified that the FBI repeatedly contacted her during their AroChem investigation, "kind of knocking in the middle of the night." Harris Ex. 13 at 24. Dunn believed that the FBI was harassing her, and she suspected that they had tapped her phone line, because she would encounter agents in unexpected places. *See id.* at 559–63. Dunn also objected to the manner in which Stroz and Shapiro interrogated her about Harris; she felt "bullied" and "scared." *Id.* at 28–29. She was asked to take several polygraph tests, where Dunn was "very uncomfortable. They wouldn't let the pressure go out of the blood pressure cuff and it was like this windowless, airless room and I couldn't go to the bathroom." *Id.* at 78. The government also refused to give Dunn a letter saying that she was not implicated in any AroChem crimes, which caused Dunn to lose a job offer at Goldman Sachs. *See id.* at 516–17. Dunn lost another job at Fearnoil, perhaps because Stroz called her employer but refused to give assurances that Dunn would not be implicated in any crime. *See id.* at 520–21. As with Sebastian, the government instructed Dunn not to attend the trial because she was a potential witness. Dunn did not appear as a witness for either side.

As with Sebastian, there is no evidence that Harris unsuccessfully sought Dunn's testimony at trial. In fact, Dunn stated to Harris's counsel that she wanted to attend the trial, and she felt she could be "useful to Will." *See* Harris Ex. 13 at 98. According to Dunn herself, counsel for Harris was in contact with Dunn, and there is no reason to think that her failure to testify on Harris's behalf was due to government intimidation rather than a decision by counsel for Harris that she would not be a useful witness.

*Robert Hamblin*

 Hamblin, another oil trader at AroChem, also testified that he felt intimidated by government agents. He testified that the FBI may have been following him. *See* Harris Ex. 24 at 126. Shapiro and Stroz indicated that they did not believe his account of activities at AroChem. *See id.* at 251. Ham-

blin said that Stroz once accompanied him to an elevator, asked him if he had "two small children," and told him that if Harris were found guilty and then claimed that Hamblin lied or perjured himself, Hamblin "could be in big trouble." *Id.* at 140. Hamblin also was under the impression that other Aro-Chem employees felt intimidated and bullied by the government. *See id.* at 140–41. Hamblin did not testify at Harris's trial. But although Harris asserts that the government "tried to intimidate Hamblin into not testifying for Harris," Main Br. at 160–61, there is no evidence in Hamblin's deposition or elsewhere that Harris ever attempted to utilize Hamblin as a witness.

*Karyn Lessa*

■ Harris asserts that Karyn Lessa, an operations manager at AroChem who was also personally involved with Harris, also was intimidated by the government. Lessa received a letter that she believed threatened to prosecute her for perjury. *See* Harris Ex. 31 at 213. She was listed as a potential witness for the government, and so was prohibited from attending Harris's trial, but did not ultimately appear as a witness for either Harris or the government. Lessa was identified to counsel for Harris as a witness who might possess exculpatory information, but counsel for Harris made no attempt to call her as a witness for the defense. Once again, there is no evidence that the government unconstitutionally interfered with her freedom to testify for Harris.

In sum, none of the witnesses now identified by Harris as having been subject to government intimidation was subpoenaed by Harris to testify. Accordingly we cannot know what response the witnesses or their counsel, or the government, would have made to that traditional means for obtaining testimony. Speculation "does not permit a determination of bad faith on the part of the prosecutor," *Buie,* 923 F.2d at 12.

■ Moreover, to establish government intimidation with defense witnesses, Harris must show that the government's conduct "interfered substantially with the witness's free and unhampered choice to testify," *Pinto,* 850 F.2d at 932. The record contains scant indications that these individuals wished to testify on Harris's behalf at the criminal trial, let alone that the government by its conduct thwarted that desire. None of these four witnesses has furnished an affidavit to that effect in these proceedings. Sebastian, according to his grand jury testimony, resigned from AroChem during the Companies' last days on the advice of his attorney, following a confrontation with Harris. As noted, Dunn testified during her civil deposition that she thought she could be "useful to Will," a sentiment that may reasonably be equated with a willingness to testify for him; but it was for trial counsel to evaluate Dunn's usefulness as a defense witness, and one may infer counsel's conclusion from the fact that he did not call her. One may perhaps imply a comparable desire to help on the part of Lessa, who was romantically involved with Harris at the time of the trial, but again, defense counsel made no effort to call her.

Moreover, with the possible exception of Sebastian, Harris has not shown that the absence of these witnesses "necessarily prevent[ed] a fair trial," *Buie,* 923 F.2d at 12; *see also Pinto,* 850 F.2d at 933 ("Appellants have offered nothing, beyond their conclusory assertions of Mecolta's importance, that evinces a reasonable possibility that the testimony would have affected the verdict") (citation and internal quotation marks omitted). Arguably Sebastian is in a different situation, since the government urged his inclusion in the group necessary to satisfy an element of the "Kingpin" statute; but the jury's special verdict form showed that the government satisfied that element even in Sebastian is excluded.[18] In any event, there is no show-

---

18. 18 U.S.C. § 225(b) requires that there be "at least 4 persons acting in concert." At Harris's trial, the Court charged the jury that to convict Harris on Count Twenty–Two (§ 225) the jurors "must be unanimous in your findings as to the identity of at least three persons who are acting in concert with the defendant." Trial Tr. 3301–

02. The jury reported their verdict on that point in the form of a special verdict as to Count Twenty–Two, specifying the names of six individuals who they found had acted in concert with Harris. This number, which included Sebastian, was more than sufficient to satisfy the requirement of § 225.

ing that Sebastian wished to testify on Harris's behalf at trial, and adequate reason to conclude that he did not, given the circumstances of Sebastian's departure from Aro-Chem and his subsequent refusal to speak to Harris's trial attorney.

I conclude that Harris's claims regarding government intimidation of potential defense witnesses are without merit.

### PART XIII: *Ineffective Assistance of Counsel*

In what may fairly be termed a fall-back position, habeas counsel for Harris contend that if he is not entitled to relief for the reasons previously discussed, Harris should be viewed as the victim of ineffective assistance by his trial counsel.

It is well settled that the Sixth Amendment right to counsel is "the right to the effective assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). It is equally well settled that in determining whether the assistance of counsel has been ineffective in the constitutional sense, the benchmark for decision "must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Strickland* the Court went on to articulate the controlling criteria:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the

adversary process that renders the result unreliable.

*Id.* at 687, 104 S.Ct. 2052.

Given those criteria, "analysis focusing solely on mere outcome determination, without attention as to whether the result of the proceeding was fundamentally fair or unreliable, is defective. To set aside a conviction or a sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Lockhart v. Fretwell,* 506 U.S. 364, 369–70, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (footnote omitted).

Under the Second Circuit's distillation of the *Strickland* components, "[i]n order to establish a constitutional claim of ineffective assistance of counsel, a convicted defendant must show both (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for the deficiency, the likely outcome of the proceeding would have been different." *Hooper v. United States,* 112 F.3d 83, 87 (2d Cir.1997). In evaluating the prejudice component of the *Strickland* test, "a court must determine whether, absent counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different," *id.,* a "reasonable probability" being defined as "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052.

Reverting to the first component, in assessing the objective reasonableness of defense counsel's trial performance, courts "must view the defendant's claim through the eyes of trial counsel, not through 'the distorting effects of hindsight.'" *United States v. Javino,* 960 F.2d 1137, 1145 (2d Cir.1992), citing and quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Continuing to quote *Strickland,* the Second Circuit held in *Javino* that "[a]ctions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." *Id.;* see also *Kieser v. People of the State of New York,* 56 F.3d 16, 18 (2d Cir.1995) (same).

These strictures require a defendant claiming the ineffective assistance of counsel

to overcome the presumption that trial counsel's conduct could be characterized as reasonable trial strategy. The Supreme Court articulated that presumption in *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, *the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.* (emphasis added) (citations and internal quotation marks omitted).

*Strickland* further held that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *id.* at 690, 104 S.Ct. 2052.

It follows that in evaluating an ineffective assistance of counsel claim, "[t]he court's central concern is not with 'grad[ing] counsel's performance' but with discerning 'whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" *United States v. Aguirre*, 912 F.2d 555, 561 (2d Cir.1990) (citing and quoting *Strickland*). In evaluating the reasonableness of defense counsel's strategic decisions, a court should consider the nature of the defenses available to the defendant and the strength of the government's evidence against him. *See Kieser*, 56 F.3d at 18.

Before turning to the specific criticisms of defense counsel's performance that habeas counsel for Harris make, I think it is appropriate to note that the lead trial counsel for Harris, Lawrence Iason, is an experienced criminal trial lawyer. Iason had been a senior prosecutor with the office of the United States Attorney for this district, before becoming a partner with a well-regarded firm of criminal defense attorneys in this City. To say this is not to shield trial counsel from the judicial scrutiny required by his client's post-conviction claim that counsel's assistance was constitutionally ineffective. But the considerable experience of defense counsel does nothing to lessen the presumption of reasonable trial strategy that Harris must overcome; a task that might be easier if, by contrast, Harris had quixotically placed his defense in the hands of a young cousin recently graduated from law school, who had never tried a criminal case.

The main thrust of habeas counsel's criticism of trial counsel is that trial counsel "relied upon the good faith of the government," and that had he not done so, counsel would have investigated the case and conducted the trial in various different ways. Main Brief for Harris at 271–274.

 One must place these criticisms within the context of the defense theories available to Harris and the nature and strength of the government's proof. That is not a simple task, since the nature of the defense that habeas counsel appear to contend should have been advanced is not entirely clear. Habeas counsel argue that Dispenza was the chief architect of any fraudulent practices at AroChem, and that Harris knew nothing of the fraud; but they then contend that the Chase Group of Banks were not defrauded anyway, at least in respect of AroChem's noncompliance with the net open position covenant and the trading activities of Limited, which habeas counsel contend the Banks knew all about. There is an evident tension between these contentions, the second of which apparently leads habeas counsel to the conclusion that the responsible officers at the Banks were fully aware and zestfully approved of Harris's trading in the world oil markets, only

to pretend otherwise and seek to make Harris a scapegoat when trading losses occurred.

It is common ground that trial counsel for Harris did not pursue the latter theory of defense. Trial counsel focused upon attacking the credibility of Dispenza and Seniff, whose testimony identified Harris as the chief architect of the fraud upon the Banks. Defense counsel did not attempt to show that Bank witnesses such as Durney and Dinell had perjured themselves when they testified that the net open position covenant was important to the banks, that they did not know Harris consistently violated it, and they did not have full knowledge of Limited's trading and financing activities.

While habeas counsel now profess that they would have pursued a different trial strategy, I am not persuaded that the strategy adopted by trial counsel was unsound or lacking in objective reasonableness.

There is nothing defense counsel could have done to deprive the government, in its case in chief, of the testimony of the cooperating witnesses, Dispenza and Seniff, or the Bank officers (including but not limited to Durney and Dinell).

As for Dispenza and Seniff, defense counsel launched a vigorous attack upon their credibility, emphasizing to the jury the generous dispensations that the government gave to these two former AroChem officers to secure their cooperation.

As for Bank officers like Durney and Dinell, the contentions of habeas counsel that they perjured themselves in the manners indicated could have been pursued by trial counsel by calling Harris as a witness to testify to the Bank's knowledge of what he and Limited were about; or by cross-examining the Bank witnesses by use of documents such as the BBRs, together with follow-up testimony by a defense forensic economist.

The latter tactics apply equally to Lynch, the government's expert witness.

The risks inherent in Harris testifying on any particular point, thereby exposing himself to wide-ranging cross-examination by the government on all non-collateral matters, *see United States v. Conte*, 99 F.3d 60, 66 (2d Cir.1996); *United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir.1985), are apparent, and defense counsel cannot reasonably be faulted for declining to run them.

As for efforts to persuade the jury that the Bank witnesses (as well as the government's expert Lynch) had perjured themselves, the jury would have been led into technical and esoteric areas of oil trading accounting, and there is no guarantee that the jury would have been able to follow the attempt; indeed, in an offer of proof in the present proceeding, habeas counsel claim that Harris himself could not understand the reporting and accounting documents generated by his own company. So defense counsel faced the risk of embarking upon a complicated effort to demonstrate the falsity of the Bank officers' uncomplicated testimony, which might have fallen well short of the mark, while at the same time taking the jury's focus off the much more straightforward attempt to attack the credibility of Dispenza and Seniff.

I am not prepared to say that in this case, where the government had available to it evidence from a number of sources of Harris's personal participation in a complex commercial fraud, defense counsel's strategy was unsound or objectively unreasonable. The only direct evidence that Harris personally directed the AroChem fraud came from Dispenza and Seniff; and in concentrating his fire upon the credibility of those two government witnesses, defense counsel attacked (albeit unsuccessfully) the government's case at what was arguably its weakest link. A claim of ineffective assistance of counsel cannot be derived from such circumstances.[19]

19. Two recent cases in which the Second Circuit found ineffective assistance of counsel or the possibility of it are readily distinguishable on the facts. In *DeLuca v. Lord*, 77 F.3d 578 (2d Cir. 1996), a divided panel of the Second Circuit held that following her state court conviction for murder, the habeas petitioner's showing that her defense counsel failed "to adequately consider a possible [extreme emotional disturbance] defense constituted objectively unreasonable performance," 77 F.3d at 584, the majority having previously observed that this particular defense was "of great potential importance to the strategy of [petitioner's] defense" and "was well suited to the facts [petitioner] had narrated" to her trial attorney, *id.* at 585. Indeed, when one examines

To the extent that habeas counsel complain of acts or omissions of trial counsel that "were not likely to have been foregone for strategic reasons," I am "nonetheless unable to conclude that there is any reasonable probability" that this conduct "would have affected the jury's verdict." *Kieser,* 56 F.3d at 18.

For the foregoing reasons, I conclude that Harris's claim of ineffective assistance of trial counsel is without merit.

\*　　\*　　\*　　\*　　\*　　\*

I have considered all of Harris's claims, whether or not they are discussed in this opinion, and find them to be without merit.

It follows that Harris's petition under 28 U.S.C. § 2255 for habeas corpus relief and his motion for a new trial under Rule 33 will be denied in their entirety. I perceive no need for an evidentiary hearing.

*PART XIV: Certificate of Appealability*

■ Effective April 24, 1996, Congress enacted Section 102 of the Anti–Terrorism and Effective Death Penalty Act ("the AEDPA"), which amended 28 U.S.C. § 2253 to condition appeals from orders denying habeas corpus relief upon the issuance of a certificate of appealability. *See* 28 U.S.C. § 2253(c). The AEDPA also amended Rule 22 of the Federal Rules of Appellate Procedure, which deals with the same subject.

The Second Circuit has interpreted the statute and the rule to confer upon district judges the authority to issue certificates of appealability in § 2255 cases, such as the case at bar. *See Lozada v. United States,* 107 F.3d 1011, 1016 (2d Cir.1997). Harris needs a certificate of appealability in this case, since he filed his petition after the effective date of the AEDPA and the amended rule. *See United States v. Perez,* 129 F.3d 255, 259–60 (2d Cir.1997).

Under the AEDPA, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right," § 2253(c)(2), and the certificate of appealability "shall indicate which specific issue or issues satisfy" that showing, § 2253(c)(3).

In the case at bar, I am not prepared to issue a certificate of appealability with respect to Harris's claims that the government violated its obligations under *Brady* or *Giglio,* or that the government intimidated potential defense witnesses.

I issue a certificate of appealability with respect to the remaining issues raised by the petition. Specifically, if this Court has misconstrued and enforced too broadly the requirement that evidence in support of habeas petitions be "newly discovered," Harris's underlying claims may implicate substantial constitutional due process rights. Secondly, and on a related point, if Harris's trial counsel failed to exercise due diligence to discover evidence, thereby impaling Harris upon the "newly discovered" horn, his constitutional right to the effective assistance of counsel may be implicated.

I do not think that Harris is entitled to relief on any of these grounds, for the rea-

---

the *DeLuca* opinion, it is apparent that the majority believed that a defense based on extreme emotional disturbance represented the defendant's only chance to qualify for reduced culpability for a homicide under the governing state law. Notwithstanding these factors, Judge Kearse dissented from the granting of the writ, quoting from *Strickland* and concluding that in the circumstances of the case, one could not condemn as "unconstitutionally defective" trial counsel's "tactical choice." 77 F.3d at 592.

In *United States v. Tarricone,* 996 F.2d 1414 (2d Cir.1993), a direct appeal from a conviction for tax evasion, where the question of whether certain documents were in defendant's handwriting was of central importance, but defense counsel failed to consult a handwriting expert, the Second Circuit concluded that defendant "has presented a sufficient claim to entitle him to a hearing as to whether his trial counsel did act ineffectively," *id.* at 1417–18, reasoning from the then-existing record that "it appears that trial counsel would have been well-advised to consult a handwriting expert," *id.* at 1418, particularly in view of "the significance attached by both counsel to the handwriting on the throughput agreement throughout the trial," *id.* at 1419. In these circumstances, the court of appeals remanded the case to the district court for an evidentiary hearing to develop a further factual record on the issue of ineffective assistance of counsel.

*DeLuca* and *Tarricone* present rare examples of trial counsel failing to utilize an available defense or resource that addressed narrow and decisive issues. The case at bar cannot be so characterized.

sons stated in this opinion, but I think it is right to issue a certificate of appealability, limited as indicated.

I will allow Harris to appeal *in forma pauperis* if he submits an affidavit that conforms with the requirements of 28 U.S.C. § 1915(a)(1).

### CONCLUSION

The Clerk of the Court is directed to dismiss Harris's habeas corpus petition to set aside his conviction. Harris's motion for a new trial is denied.

The Court issues a certificate of appealability consistent with Part XIV of this Opinion.

It is SO ORDERED.